STEPHENS, J.
I dissent. Complaint was filed against the defendants herein in the municipal court charging in Count I thereof that they “did wilfully and unlawfully hold, conduct, manage, participate in and carry on a parade, march, and procession on [certain named streets] in the City of Los Angeles, without having first made written application for and received from the Board of Police Commissioners of the City of Los Angeles, a permit so to do.” To this count the trial court sustained a demurrer without leave to amend, and dismissed the complaint as to such count. From this action of the trial court the. People present this appeal. The ordinance is set forth in full (except as to one section, not material here) in the majority opinion.
It thus appears that defendants made no attempt to obtain a permit, and made no application to the board; but on the contrary ignored the law as written upon the apparent assumption (at least as now contended) that the board not only had arbitrary power under the ordinance but would use it in an arbitrary and unreasonable manner. We are, *891 therefore, called upon to decide whether or not such action upon the part of persons coming under the regulation of the prescribed law is justified. I am convinced that such disregard of a duly enacted statute cannot be sustained unless the invalidity of the statute clearly appears upon its face, and that upon no reasonable basis can its validity be upheld.
Some years ago the judges of this appellate department, in another case, arrived at the conclusion that this ordinance was invalid because “it failed to provide a guide whereby the Board of Police Commissioners was to determine whether a permit should or should not be granted.” The majority opinion now follows this view and in doing so finds it necessary to disagree with, or distinguish, the later decision of the United States Supreme Court in the case of Cox v. New Hampshire (1940), 312 U.S. 569 [61 S.Ct. 762, 85 L.Ed. 1049, 133 A.L.R. 1396]. I shall, therefore, discuss that case first of all. The only distinction suggested is that the New Hampshire Supreme Court construed the law there under consideration in such a manner as to practically amend it and that under well established principles the Supreme Court of the United States approved it as thus construed. I disagree with this view. An examination of the ease in the light of the principles of interpretation established by the decisions and statutes of this state shows that insofar as anything said therein affects, or is necessary to the matter with which we are here concerned or the decision of the United States Supreme Court thereon, the New Hampshire court merely construed the law in a common sense manner and upon the same principles of construction followed by our own courts in numerous cases. (I do not consider that the preliminary discussion by the New Hampshire court concerning title to streets is necessary to the decision or that it in any manner affected the decision of the United States Supreme Court.) The decision added nothing to the law as enacted and took nothing away. In fact, the New Hampshire court (91 N.H. 137 [16 A.2d 508, at p. 513]) specifically disavows any such intention in the following language: “Where a statute is'fairly susceptible of two interpretations, one rendering it constitutional and one not, that construction will ordinarily be adopted which will uphold its constitutionality. . . . While ‘words, provisions, or modifications’ may not at all events be read into a law to the end that it may be clothed with constitutional validity (State v. Gerry, 68 N.H. 495, 503, 38 A. 272, 276, 38 L.R.A. 228), yet when the lan *892 guage used fairly admits of a construction which endows the law with validity, that construction will be adopted in preference to an opposing construction. ’ ’ In connection with the interpretation of statutes, our Civil Code, section 3541, provides as follows: “An interpretation which gives effect is preferred to one'which makes void.” That is exactly what the New Hampshire court did. For all the purposes which concern us, the statutes under consideration there and here are the same, except that upon comparison, our ordinance is much more obviously directed solely to the regulation of streets as arteries of travel, because the New Hampshire law also attempted to put “open-air public meetings upon any ground abutting thereon” in the same category as the streets, in requiring a permit. This was held invalid, while the provision as to streets was sustained, but the very fact that this was included suggests that the New Hampshire legislative body may have had in mind something other than the traffic-angle. No such possible inference can be deduced from our ordinance. The New Hampshire law made no reference to any standard to be observed nor even the purpose of its enactment, but the necessity of the law for the obvious purpose of controlling traffic was apparent both to the United States and New Hampshire Supreme Courts. Such obvious interpretation sustained the law, while the one now adopted in the majority opinion would have made it void. (Civ. Code, § 3541, supra.) In my opinion, the New Hampshire law cannot be distinguished from our ordinance upon any fundamental basis, and it follows that the decision of the United States Supreme Court should control our action -here upon a federal constitutional question.
I quote from the latter decision wherein it quotes from the New Hampshire Supreme Court, as follows: “The obvious advantage of requiring application for a permit was noted as giving the public authorities notice in advance so as to afford opportunity for proper policing. And the court further observed that, in fixing time and place, the license served .‘to prevent confusion by overlapping parades or processions, to secure convenient use of the streets by other travelers, and to minimize the risk of disorder.’ But the court held that the licensing board was not vested with arbitrary power or an unfettered discretion; that its discretion must be exercised with ‘uniformity of method of treatment upon the facts of each application, free from improper or inappropri *893 ate considerations and from unfair discrimination’; that a ‘systematic, consistent and just order of treatment, with reference to the convenience of public use of the highways, is the statutory mandate. ’ The defendants, said the court, ‘had a right, under the Act, to a license to march when, where and as they did, if after a required investigation it was found that the convenience of the public in the use of the streets would not thereby be unduly disturbed, upon such conditions or changes in time, place and manner as would avoid disturbance. ’ ”
An examination of the two decisions (by the United States and New Hampshire Supreme Courts) in the Cox v. New Hampshire case discloses that the only principle laid down by the New Hampshire court and relied upon by the United States court in having any controlling effect upon the latter is that the grant of power to issue permits is not one to be used arbitrarily but only in the honest exercise of a reasonable discretion. Our own Supreme Court in a long time of decisions has given exactly that construction to laws giving similar powers in this state. The principles discussed and laid down by the United States Supreme Court in its decision, and which should be a guide to us, are its own and not those of the New Hampshire court.
That the jurisdiction of the officer or board to whom such authority is given is thus limited has been held by our own Supreme Court many times. In Gaylord v. Pasadena (1917), 175 Cal. 433 [166 P. 348], the court had before it an ordinance which gave to the city electrician the power to examine “any electric wiring, connections, fixtures, appliances, apparatus, machinery, equipment, or work” already installed in any building, and if he determined it was dangerous to life or property, he was empowered to notify the owner to cease using it and to make the changes required by such city electrician within a designated number of days. No other standard for his determination is provided. The ordinance was held valid, and I shall quote more fully from the decision later; upon the point presently being discussed the court says, at page 437: ‘ ‘ That an official charged with such a duty as this may, and indeed must, exercise discretion precisely as he may or must exercise judgment is, of course, true, hut this fact in no way militates against the validity of the law, for, as said in the Van de Carr case, supra, ‘the authority *894 sustained is the grant of power to issue or withhold permits in the honest exercise of a reasonable discretion” (Emphasis added.)
In the ease of Riley v. Chambers (1919), 181 Cal. 589 [185 P. 855, 8 A.L.R. 418], the court had before it the law which empowered the Real Estate Commissioner to issue a permit to a person to act as real estate broker upon finding him to be “honest, truthful and of good reputation.” The court notes that the law does not in so many words authorize the commissioner to deny a permit but holds that such authority is necessarily implied. He is also empowered to revoke upon presentation of written charges. Answering an attack upon the law similar to the one we are now considering, the court says, at page 595: “But it may be said that the power of the commissioner to refuse a license if he is not satisfied as to the character of the applicant practically gives him arbitrary power as he alone can determine whether he is satisfied or not. This, however, is not true. While the commissioner has the power to refuse a license if he is not satisfied as to the character of the applicant, his discretion is not arbitrary. There must exist facts which reasonably justify his conclusion that the applicant is not of good character and reputation. If such facts do not exist, it is his duty to issue the license and this duty can be enforced by the courts.”
Furthermore, as indicated by the last sentence above quoted, the courts of this state have taken the next logical step, based upon this limitation of the authority vested in the officer or board and have held that mandate will lie to compel the' issuance of a permit in the event it is arbitrarily withheld. In Gaylord v. Pasadena, supra, 175 Cal. at page 439, the court says -. ‘ ‘ An unnecessary liberality is shown in this ordinance in conferring, as it does, a right of appeal to the council, for the ordinance, if good at all, would unquestionably be good without such right of appeal, and the householder conceiving himself to be injured would be left to his action in court.”
The case of In re Holmes (1921), 187 Cal. 640 [203 P. 398], involved an ordinance of the city and county of San Francisco empowering the Board of Police Commissioners to grant or refuse permits to persons desiring to engage in selling and dealing in secondhand books, and in response to an attack thereon upon the ground that it gave arbitrary and uncontrolled power to the board, the court says, at page 646: “ ‘Many cases are to be found sustaining ordinances *895 prohibiting acts, or even the following of trades or occupations, without procuring permits which may be issued at the discretion of the council, mayor, or some other city officer or department, and the fact that the dispensing power was apparently conferred without restraint or qualification has been regarded as arising merely from the difficulty of defining in advance upon what conditions the permits shall be given or the dispensing power exercised. It has been said that it is not to be assumed that the council or officer, in exercising the dispensing power, will act arbitrarily, or otherwise than in the exercise of a sound discretion.’ ... If this petitioner had applied for a permit under the requirement of the section of the charter above quoted, and been either whimsically or arbitrarily refused such permit, he might then, as is shown in Gaylord v. City of Pasadena, supra, have had recourse to the courts for relief from such unjust and arbitrary action.”
In Butterworth v. Boyd (1938), 12 Cal.2d 140 [82 P.2d 434, 126 A.L.R. 838], the court had under consideration a charter provision in which certain officers were given authority to make determinations and this was attacked as arbitrary and for which no standard was set up. The court says, at page 149: “It is to be presumed that the board will exercise its powers in conformity with the requirements of the Constitution; and if it does act unfairly, the fault lies with the board and not the statute. Constitutional guaranties against arbitrary and discriminating action are read into the law, and the courts will compel administrative officials to respect them.” (Emphasis added.)
It may be noted that our ordinance, like the law discussed in Riley v. Chambers, supra, 181 Cal. 589, does not in words empower the board to deny the application for a permit; however, as said in that case, such power is necessarily implied. It would be am, anomaly to say that the law implies an arbitrary and illegal power.
It is axiomatic that every intendment is in favor of the validity of a law and that “the authority of the courts to declare a regulation invalid will be exercised with caution and only when it is clear that the law exceeds the limit of legislative power and infringes upon rights guaranteed by the Constitution.” The above quotation is from Bernstein v. Bush (Mar. 1947), 29 Cal.2d 773, 777 [177 P.2d 913], citing the well known ease of Dobbins v. Los Angeles, 195 U.S. 223 *896 [25 S.Ct. 18, 49 L.Ed. 169]. (See, also, In re Jones (1943), 56 Cal.App.2d 658, at 665 [133 P.2d 418],
There are numerous cases in California sustaining laws requiring the obtaining of a permit from a board or officer with no more clearly defined standards fixed therein than in the ordinance here under examination. I again quote from Gaylord v. Pasadena, supra, 175 Cal. at pages 436 and 439: “Even a casual observer of governmental growth and development must have observed the ever-increasing multiplicity and complexity of administrative affairs-—national, state and municipal—and even the occasional reader of the law must have perceived that from necessity, if for no better grounded reason, it has become increasingly imperative that many quasi-legislative and qwcm’-judicial functions, which in smaller communities and under more primitive conditions were performed directly by the legislative or judicial branches of the government, are intrusted to departments, boards, commissions, and agents. No sound objection can longer be successfully advanced to this growing method of transacting public business. ... It [the ordinance under attack] does not define what conditions the city electrician must find to exist before he determines that the electrical apparatus is unsafe or dangerous. From the very nature and character of such apparatus it would be impossible for any ordinance so to do without working in many instances the very oppression which its language, necessarily general, is designed to prevent. As we have said, it is presumed that the city electrician will act fairly.” To same effect, see In re Holmes, supra, 187 Cal. 640 ; Riley v. Chambers, supra, 181 Cal. 589 ; In re Hartmann (1938), 25 Cal.App.2d 55, 60 [76 P.2d 709], where the court says, “We may not assume the chief of police will arbitrarily refuse to grant permits to canvass for subscriptions without good cause. The presumption is that every officer will perform his full duty in a fair and lawful manner.” Citing In re Flaherty, 105 Cal. 558 [38 P. 981, 27 L.R.A. 529] ; In re Jones (1943), 56 Cal.App.2d 658 [133 P.2d 418] ; Gospel Army v. City of Los Angeles (1945), 27 Cal.2d 232 [163 P.2d 704], in which the authority given to the Board of Police Commissioners to issue permits to secondhand goods dealers is similarly attacked, and the court says, at page 249: ‘ ‘ The board has no discretion to withhold a license if the applicant ’s good character and reputation and his financial responsibility are established and the required bond is filed. The *897 board is not free to deny licenses, but must act reasonably in the light of the evidence presented.” (Citing many cases.) See, also, Carter v. Stevens (1930), 211 Cal. 281 [295 P. 28], specifically approving Gaylord v. Pasadena, 175 Cal. 433 [166 P. 348], and quoting at length from it. The early but often quoted case of In re Flaherty (1895), 105 Cal. 558 [38 P. 981, 27 L.R.A. 529], is direct authority for the ordinance in question, insofar as the presumption concerning the performance of official duty is concerned. The following statement from that case has been quoted in later California cases too numerous to mention: “Laws are not made upon the theory of the total depravity of those who are elected to administer them; and the presumption is that municipal officers will not use these small powers villainously and for purposes of oppression and mischief.” In fact, we find this exact quotation in a recent case in this Appellate Department— People v. Walton (1945), 70 Cal.App.2d Supp. 862 [161 P.2d 498]. In that case a county ordinance made it unlawful for a minor under eighteen years of age to remain upon a public street, park, etc., between certain hours without a permit from the sheriff, which the latter was authorized to issue upon application of the parent or guardian, stating the name and age of such minor, his description and the reason for such permit. This court sustained the validity of the ordinance and said, at page 870: “It is readily apparent that the discretion so reposed in the sheriff to grant or deny such permit is not an arbitrary, unbridled or unlimited one, but is based upon grounds of reasonable necessity as shown by the facts and reasons therefor set forth in the written application. ” See, also, Mutual Film Corp. v. Industrial Com. of Ohio (1915), 236 U.S. 230 [35 S.Ct. 387, 59 L.Ed. 552, at 560], discussing alleged lack of standard in the law.
The ordinance before us, like the one under discussion in People v. Walton, supra, requires the filing of an application setting forth certain information, viz., the course to be traveled, time of starting, names of persons in control or responsible, and the purpose of the proposed parade. These clearly indicate the nature of the information which must he considered by the board in passing upon the application and each is consistent with the purpose of bringing out facts necessary to be known in order to decide whether or not issuance of the permit is consistent with traffic conditions at any particualr time and *898 place. The fact that this detailed information is required to be presented to the board before any permit is issued clearly refutes any claim that the power given to the board was to be exercised arbitrarily or for some capricious reason of its own; furthermore, upon no basis of decision whatever except the control of traffic could all of the information thus required be material to their consideration of the application. Manifestly, as hereinafter more specifically pointed out, no general ordinance could contemplate and provide for all the situations presented by the facts thus placed before the board. The only one of these inquiries which could possibly be said to be such as would give information upon which the board could violate its duty by acting capriciously and arbitrarily instead of in accordance with its plain duty, is the one requiring a statement of the purpose of the parade. However, upon reflection, it will be seen that this information is perhaps the most necessary of all in order to pass upon the legitimate purpose for requiring a permit. To illustrate, in Pasadena the parade on New Year’s day is for such a purpose and of such a nature that not only the entire police force of that city is required to handle the huge crowds, but the peace officers of neighboring cities and the motor vehicle officers of the state are called in to assist, and, in addition planes are employed to circle in the air with radio communication with the ground officers in handling the traffic and protecting life and limb, as well as the comfort and convenience of the people. On the other hand, if a permit for a parade in that city should be requested for the purpose of reviving interest in the habits of the ancient Babylonians, doubtless the normal shift of a portion of the local police force of that city on duty at the particular time could readily handle the situation; and these would be needed primarily to keep the small number of paraders from being run over by the normal flow of traffic.
As said by the court in the case of In re Anderson (1933), 130 Cal.App. 395, 398 [19 P.2d 1027] : “The primary purpose of a highway is the passing and repassing of the public, which is entitled so far as needed to the full, unobstructed and uninterrupted enjoyment of the entire width of the layout for that purpose, ’ ’ and even though historically the streets may have been used also for dissemination of ideas by parades, this has always been subject to the primary and basic purpose of furnishing a place for transportation. The relation of these two uses might be compared, by analogy, to a first lien and *899 a junior lien; or to the respective rights of the public and the owner of the fee in streets where the public has only a right of way, in which case the owner may make all uses of the property not inconsistent* with street use, but as the latter requirement grows with greater public need, the rights of the fee owner are correspondingly lessened. (Colegrove W. Co. v. City of Hollywood (1907), 151 Cal. 425, 430 [90 P. 1053, 13 L.R.A.N.S. 904].) The growth of the demand upon the streets for their primary purpose and the lessening of the need for their use as avenues for the dissemination of ideas have gone hand in hand and are matters of common knowledge. In the very nature of things no possible new idea or invention can take the place of streets for the purpose of accommodating traffic—there is no substitute for streets but more streets; yet modern invention and increased production are constantly adding to the widespread use of motor vehicles, including huge trucks and busses, thus piling up the burden on streets and constantly increasing the danger to life and limb until the alarming number of fatalities has created a national as well as local problem. On the other hand, as to the facilities for free speech, which may be called the secondary use of streets, and which is made to loom so large in its presentation in this case, the situation is just the reverse. Modern invention and progress are constantly facilitating the exercise of free speech and dissemination of ideas by radio, motion pictures, telephone, constantly expanding press, innumerable magazines, more presses for printing of handbills, increasing number of public meeting places, automobiles, and even planes, equipped with loud speakers, and now television. In view of these considerations, and weighing the protection of life, limb and safety in traffic against possible curtailment of free speech, “the interference with freedom of speech and writing seem slight” (Cox v. New Hampshire, supra); especially since such interference is brought about by natural conditions and not arbitrarily imposed by law.
It is important to have in mind that while fundamental rights and principles never change, the manner and extent of their exercise must of necessity vary with changing conditions. The right of free speech is a fundamental right that goes with the individual anywhere he may be, but the extent to which and the manner in which he may exercise it vary with places and circumstances. The right to engage in a parade is not a fundamental right but is merely one phase of the exer *900 cise of the fundamental right of free speech. The manner and extent of its exercise is limited by similar or more important rights of others using the streets at the same time for their primary purpose. This limit is brought about by the circumstances themselves rather than by any law.
A parade is defined by Webster’s dictionary as, “1. Pompous show; formal display or exhibition. 3. Any march or procession ; esp. a formal public procession; the movement of any body marshaled in something like military order.” Such an activity necessarily involves the exclusive use of all or a substantial portion of the street to the exclusion of all others. Does any person or group of persons have a fundamental right to such exclusive use ? If so, how many groups have the same right at the same time f Only the moving of persons in mass formation or parade order involving in greater or less degree the exclusive use of the street is within the ordinance, by which such use is adapted to the primary purpose of such streets. No other manner of the exercise of free speech in the street is touched by the ordinance—distributing handbills, carrying banners on foot or in cars, full discussion with others on the street, calling out from cars or any other phase of free speech, even the movement of a group of persons or cars not unduly burdening the street and not in parade formation.
The majority opinion recognizes the right of the city to regulate the holding of parades but insists that the ordinance is void because it fixes no standard to be observed by the board in granting or withholding permits, with the result that the board could act arbitrarily and perhaps deny a permit to those with whose economic, political or other ideas of the board might disagree.
It seems to me this ordinance is one whose standard is obvious from its purpose. The police department has the duty of enforcing all ordinances having to do with the regulation of traffic on the streets and the police commission is given authority by the charter (§ 204) to create a special bureau devoted to this. The ordinance before us, giving that commission the responsibility of passing upon applications for parades is in full consonance with these duties. On the other hand, to assume that the board in passing upon such applications will do so from the standpoint of censors instead of in connection with traffic considerations, is to assume that they will ignore their obvious and recognized powers in their own field and step into the field of censorship without the slightest *901 basis therefor in any ordinance or charter provision, or state law or the decisions of onr courts. But let us assume that the ordinance should state that the standard by which the commission shall be guided is the safety, comfort and welfare of persons using the street. That would add nothing to the information of the commission because it is something that is already obvious and implicit in the present ordinance in the light of the information required by the ordinance to be presented to the board and of the powers customarily exercised by our police department; and if we are to assume that the commission is to be arbitrary and reckless of their sworn duty (a necessary assumption under the majority opinion) then there is nothing magic in the words above suggested, and venal board members could just as readily accomplish their desire to be unfair by placing their decision ostensibly upon public safety. We would still require the aid of the presumption that official duty would be regularly and honestly performed; but upon what theory should we indulge it then, but reject it in the broad view of the ordinance now before us? The only other course then would be for the ordinance to set forth in detail all the days and hours on which parades should or should not be permitted on each of the innumerable streets in the many congested shopping centers of this sprawling metropolis, in such manner as to leave nothing to the discretion of the board. The detail suggested above for such an ordinance would alone make the task impractical, but when we add to it the necessity of anticipating future conditions and unpredictable emergencies or special circumstances that would make the holding of a parade undesirable and contrary to the general welfare in any particular district or street on any particular day in the future, the impossibility of such an undertaking becomes at once apparent.
The Bill of Rights of the United States Constitution is not a set of by-laws but statements of fundamental rights. They are to be applied by the courts to conditions and affairs as they exist from time to time in harmony with the general welfare of the whole people and the practical operation of our scheme of government. The presumption that official duty will be honestly and fairly performed is absolutely necessary to governmental operation, for laws cannot be made wholly automatic. As the Supreme Court of the United States once said, “Wherever power is lodged it may be abused. But this forms no solid objection against its exercise. Confidence must *902 be reposed somewhere. ...” (Ex parte Terry (1888), 128 U.S. 289 [9 S.Ct. 77, 32 L.Ed. 405].)
It would unduly extend this opinion to discuss each of the cases relied upon in the majority opinion. Many of them are specifically distinguished by the United States Supreme Court in Cox v. New Hampshire, 312 U.S. 569 (supra), in the following language: ‘ ‘ The decisions upon which appellants rely are not applicable. In Lovell v. Griffin, 303 U.S. 444, 82 L.ed. 949, 58 S.Ct. 666, supra, the ordinance prohibited the distribution of literature of any kind at any time, at any place, and in any manner without a permit from the city manager, thus striking at the very foundation of the freedom of the press by subjecting it to license and censorship. In Hague v. Committee for Industrial Organization, 307 U.S. 496, 83 L.ed. 1423, 59 S.Ct. 954, supra, the ordinance dealt with the exercise of the right of assembly for the purpose of communicating views; it did not make comfort or convenience in the use of streets the standard of official action but enabled the local official absolutely to refuse a permit on his mere opinion that such refusal would prevent ‘riots, disturbances or disorderly assemblage. ’ The ordinance thus created as the record disclosed, an instrument of arbitrary suppression of opinions on public questions. The court said that ‘uncontrolled official suppression of the privilege cannot be made a substitute for the duty to maintain order in connection with the exercise of the right.’ In Schneider v. Irvington, supra, (308 U.S. p. 163, 84 L.ed. 165, 60 S.Ct. 146) the ordinance was directed at canvassing and banned unlicensed communication of any views, or the advocacy of, any cause, from door to door, subject only to the power of a police officer to determine as a censor what literature might be distributed and who might distribute it. In Cantwell v. Connecticut, supra, (310 U.S. p. 305, 84 L.ed. 1218, 60 S.Ct. 900,128 A.L.R. 1352) the statute dealt with the solicitation of funds for religious causes and authorized an official to determine whether the cause was a religious one and to refuse a permit if he determined it was not, thus establishing a censorship of religion.
“Nor is any question of peaceful picketing here involved, as in Thornhill v. Alabama, 310 U.S. 88, 84 L.ed. 1093, 60 S.Ct. 736, and Carlson v. California, 310 U.S. 106, 84 L.ed. 1104, 60 S.Ct. 746. The statute, as the state court said, is not aimed at any restraint of freedom of speech, and there is no basis for an assumption that it would be applied so as to pre *903 vent peaceful picketing as described in the cases cited.” (Emphasis added.) Further, the parade ordinance involved in the Hague case was only one phase of what the trial court actually found to be a conspiracy which constituted a shining example of what was termed in Yick Wo v. Hopkins (1886), 118 U.S. 356 [6 S.Ct. 1064, 30 L.Ed. 220], an administration by public authority, “with an evil eye and an unequal hand.”
The distinction between our case and Lovell v. Griffin, 303 U.S. 444, 588 S.Ct. 666, 82 L.Ed. 949], is that in the latter the law directly attacks a fundamental right—the distribution of literature “of any kind, at any time, at any place or in any manner”; it does not and cannot possibly be construed as a regulation to adapt the exercise of this right to another equally necessary right, but is an attempted bold authority to deprive the citizen of this right directly and solely and -without regard to the exercise of any other right by other persons. The real vice of this and similar laws, therefore, is not that they do not fix a standard, but that in the very nature of the subject involved, no fixed standard other than the will of the licensing authority was intended or could possibly be construed as having been intended. An examination of the other cases decided by the United States and California Supreme Courts, and cited in the majority opinion, shows that a similar distinction exists as to substantially all of them, including the Porterfield case so heavily relied upon.
Extensive quotation upon the general subject of the importance of parades as instruments of free speech is made from two decisions, one by the Supreme Court of Kansas, and the other by the Illinois Court of Appeals. The former was rendered in 1888, and the latter in 1891. Those were the days when boys played marbles and men in shirt sleeves amused themselves by playing baseball in the streets of the towns with no danger to themselves or interference with traffic, and parades posed no problem other than possible frightening of some farmer’s skittish colt. They are hardly proper guides at this time concerning an ordinance obviously designed to prevent obstruction to the free flow of traffic in this great metropolitan center.
The majority opinion, conscious of the antiquity of these cases, says “. . . we entertain no doubt that the long existing right to parade, subject to regulation though it is, has not become so decrepit through the years that it may be denied with impunity. ’ ’ On the other hand, however great may be *904 our respect for this ancient right, it must, like our honored and respected elders of similar years, adjust itself to changed conditions and not endanger the safety of all by needlessly stepping into the pathway of oncoming modern traffic. The point is, of course, that it is not our respect for the abstract right which has changed, but the circumstances under which it may be properly exercised.
The words of Justice Frankfurter in his separate opinion in the case of Martin v. Struthers (1943), 319 U.S. 141 [63 S.Ct. 862, 87 L.Ed. 1313], seem particularly appropriate: “From generation to generation fresh vindication is given to the prophetic wisdom of the framers of the Constitution in casting it in terms so broad that it has adaptable vitality for the drastic changes in our society which they knew to be inevitable, even though they could not foresee them. . . . The Constitution cannot be applied in disregard of the external circumstances in which men live and move and have their being. Therefore neither the First nor the Fourteenth Amendment is to be treated by judges as though it were a mathematical abstraction, an absolute having no relation to the lives of men.”
Great reliance has been placed upon the decision of our Supreme Court in In re Porterfield (1946), 28 Cal.2d 91 [168 P.2d 706]. I find no conflict therein with the views I have expressed, nor with the prior decisions of this court .upon which they are based. In the first place, it is not a parade case, and deals with a very different activity—one dealing directly with a fundamental freedom and not merely limiting one phase of an activity in the face of a greater need. The reliance is principally on the general statement in the opinion (p. 112), as follows: “This contention (the presumption that the council will perform its duty in a fair and impartial manner) rests upon the assumption that no question of, or akin to that of, free speech is presented, for where free speech or any other fundamental right is involved the presumption of proper action by the licensing authority cannot be relied upon.” This is a broad statement of general principle and I am not persuaded that the court intended to say that under every imaginable situation, if the right óf free speech or any other fundamental right is involved even in the slightest and most remote degree, any law which vests any discretion whatever in a public official must be declared void, even though the problem involved by its own nature permits of no definite *905 and precise detailed standards which will contemplate each possible contingency; and even though the proposed exercise of such asserted right would necessarily conflict with the exercise of equally necessary and important rights by others; and that as to such laws we must proceed “upon the theory of the total depravity of those who are elected to administer them.” (In re Flaherty (1895), 105 Cal. 558, 562 [38 P. 981, 27 L.R.A. 529].) I do not believe that the words “akin to free speech” were intended to be so far reaching as to eliminate from the principles so thoroughly established in this state a law upon a subject necessary to the public safety and welfare merely because as a remote incident thereof there is a possibility of curtailment of the right to exercise that full freedom of speech, through some particular channel, that some individual may desire. In my opinion, the court had in mind a law which directly or necessarily restricts to a substantial degree the exercise of such right. All constitutional and other rights of the individual must be exercised in deference to and in conformity with similar rights of others and the safety and welfare of the public. Even in Cantwell v. Connecticut (1940), 310 U.S. 296 [60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352], which has been cited, the court says: “No one would have the hardihood to suggest that the principle of freedom of speech sanctions incitement to riot or that religious liberty connotes the privilege to exhort others to physical attack upon those belonging to another sect. When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the state to prevent or punish is obvious.... There are limits to the exercise of these liberties.” (Emphasis added.)
Again quoting from the opinion of the United States Supreme Court in Cox v. New Hampshire: “Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses. The authority of a municipality to impose regulations in order to assure the safety and convenience of the people in the use of public highways has never been regarded as inconsistent with civil liberties but rather as one of the means of safeguarding the good order upon which they ultimately depend. The control of travel on the streets of cities is the most familiar illustration of this recognition of social *906 need. Where a restriction of the use of highways in that relation is designed to promote the public convenience in the interest of all, it cannot be disregarded by the attempted exercise of some civil right which in other circumstances would be entitled to protection.” (Emphasis added.)
In my opinion, the section of the Municipal Code in question constitutes a valid exercise of the police power, and is fully sustained by the decision of the United States Supreme Court in Cox v. New Hampshire, supra; and it follows therefrom that the order of the trial court in dismissing this count of the complaint should be vacated and the case remanded with instructions to overrule the demurrer.