COX ET AL. *v.* NEW HAMPSHIRE.

No. 502. Argued March 7, 1941.—Decided March 31, 1941.

*Mr. Hayden Covington,* with whom *Mr. Joseph F. Rutherford* was on the brief, for appellants.

*Mr. Frank R. Kenison,* Attorney General of New Hampshire, with whom *Messrs. J. Vincent Broderick* and *Jeremy R. Waldron* were on the brief, for appellee.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

Appellants are five "Jehovah's Witnesses" who, with sixty-three others of the same persuasion, were convicted in the municipal court of Manchester, New Hampshire, for violation of a state statute prohibiting a "parade or

procession" upon a public street without a special license.

Upon appeal, there was a trial *de novo* of these appellants before a jury in the Superior Court, the other defendants having agreed to abide by the final decision in that proceeding. Appellants were found guilty and the judgment of conviction was affirmed by the Supreme Court of the State. *State* v. *Cox*, 91 N. H. 137; 16 A. 2d 508.

By motions and exceptions, appellants raised the questions that the statute was invalid under the Fourteenth Amendment of the Constitution of the United States in that it deprived appellants of their rights of freedom of worship, freedom of speech and press, and freedom of assembly, vested unreasonable and unlimited arbitrary and discriminatory powers in the licensing authority, and was vague and indefinite. These contentions were overruled and the case comes here on appeal.

The statutory prohibition is as follows (New Hampshire, P. L., Chap. 145, § 2):

"No theatrical or dramatic representation shall be performed or exhibited, and no parade or procession upon any public street or way, and no open-air public meeting upon any ground abutting thereon, shall be permitted, unless a special license therefor shall first be obtained from the selectmen of the town, or from a licensing committee for cities hereinafter provided for."

The provisions for licensing are set forth in the margin.[1]

---

[1] New Hampshire, P. L., Chap. 145, §§ 3, 4, and 5 are as follows:

"Section 3: Licensing Board. Any city may create a licensing board to consist of the person who is the active head of the police department, the mayor of such city and one other person who shall be appointed by the city government, which board shall have delegated powers to investigate and decide the question of granting licenses under this chapter, and it may grant revocable blanket

572

The facts, which are conceded by the appellants to be established by the evidence, are these: The sixty-eight defendants and twenty other persons met at a hall in the City of Manchester on the evening of Saturday, July 8, 1939, "for the purpose of engaging in an information march." The company was divided into four or five groups, each with about fifteen to twenty persons. Each group then proceeded to a different part of the business district of the city and there "would line up in single-file formation and then proceed to march along the sidewalk, 'single-file,' that is, following one another." Each of the defendants carried a small staff with a sign reading "Religion is a Snare and a Racket" and on the reverse "Serve God and Christ the King." Some of the marchers carried placards bearing the statement "Fascism or Freedom. Hear Judge Rutherford and Face the Facts." The marchers also handed out printed leaflets announcing a meeting to be held at a later time in the hall from which they had started, where a talk on government would be given to the public free of charge. Defendants did not apply for a permit and none was issued.

There was a dispute in the evidence as to the distance

licenses to fraternal and other like organizations, to theatres and to undertakers.

"Section 4: Licenses: Fees. Every such special license shall be in writing, and shall specify the day and hour of the permit to perform or exhibit or of such parade, procession or open-air public meeting. Every licensee shall pay in advance for such license, for the use of the city or town, a sum not more than three hundred dollars for each day such licensee shall perform or exhibit, or such parade, procession or open-air public meeting shall take place; but the fee for a license to exhibit in any hall shall not exceed fifty dollars.

"Section 5: Penalty. If any person shall violate the provisions of the preceding sections he shall be fined not more than five hundred dollars; and it shall be the duty of the selectmen to prosecute for every violation of this chapter."

between the marchers. Defendants said that they were from fifteen to twenty feet apart. The State insists that the evidence clearly showed that the "marchers were as close together as it was possible for them to walk." Appellants concede that this dispute is not material to the questions presented. The recital of facts which prefaced the opinion of the state court thus summarizes the effect of the march: "Manchester had a population of over 75,000 in 1930, and there was testimony that on Saturday nights in an hour's time 26,000 persons passed one of the intersections where the defendants marched. The marchers interfered with the normal sidewalk travel, but no technical breach of the peace occurred. The march was a prearranged affair, and no permit for it was sought, although the defendants understood that under the statute one was required."

Appellants urge that each of the defendants was a minister ordained to preach the gospel in accordance with his belief and that the participation of these ministers in the march was for the purpose of disseminating information in the public interest and was one of their ways of worship.

The sole charge against appellants was that they were "taking part in a parade or procession" on public streets without a permit as the statute required. They were not prosecuted for distributing leaflets, or for conveying information by placards or otherwise, or for issuing invitations to a public meeting, or for holding a public meeting, or for maintaining or expressing religious beliefs. Their right to do any one of these things apart from engaging in a "parade or procession" upon a public street is not here involved and the question of the validity of a statute addressed to any other sort of conduct than that complained of is not before us.

There appears to be no ground for challenging the ruling of the state court that appellants were in fact

engaged in a parade or procession upon the public streets. As the state court observed: "It was a march in formation, and its advertising and informatory purpose did not make it otherwise. . . . It is immaterial that its tactics were few and simple. It is enough that it proceeded in an ordered and close file as a collective body of persons on the city streets."

Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses. The authority of a municipality to impose regulations in order to assure the safety and convenience of the people in the use of public highways has never been regarded as inconsistent with civil liberties but rather as one of the means of safeguarding the good order upon which they ultimately depend. The control of travel on the streets of cities is the most familiar illustration of this recognition of social need. Where a restriction of the use of highways in that relation is designed to promote the public convenience in the interest of all, it cannot be disregarded by the attempted exercise of some civil right which in other circumstances would be entitled to protection. One would not be justified in ignoring the familiar red traffic light because he thought it his religious duty to disobey the municipal command or sought by that means to direct public attention to an announcement of his opinions. As regulation of the use of the streets for parades and processions is a traditional exercise of control by local government, the question in a particular case is whether that control is exerted so as not to deny or unwarrantedly abridge the right of assembly and the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places. *Lovell* v. *Griffin*, 303 U. S. 444, 451; *Hague* v. *Committee for Industrial Organiza-*

*tion,* 307 U. S. 496, 515, 516; *Schneider* v. *State,* 308 U. S. 147, 160; *Cantwell* v. *Connecticut,* 310 U. S. 296, 306, 307.

In the instant case, we are aided by the opinion of the Supreme Court of the State, which construed the statute and defined the limitations of the authority conferred for the granting of licenses for parades and processions. The court observed that if the clause of the Act requiring a license "for all open-air public meetings upon land contiguous to a highway" was invalid, that invalidity did not nullify the Act in its application to the other situations described. Recognizing the importance of the civil liberties invoked by appellants, the court thought it significant that the statute prescribed "no measures for controlling or suppressing the publication on the highways of facts and opinions, either by speech or by writing"; that communication "by the distribution of literature or by the display of placards and signs" was in no respect regulated by the statute; that the regulation with respect to parades and processions was applicable only "to organized formations of persons using the highways"; and that "the defendants, separately, or collectively in groups not constituting a parade or procession," were "under no contemplation of the Act." In this light, the court thought that interference with liberty of speech and writing seemed slight; that the distribution of pamphlets and folders by the groups "traveling in unorganized fashion" would have had as large a circulation, and that "signs carried by members of the groups not in marching formation would have been as conspicuous, as published by them while in parade or procession."

It was with this view of the limited objective of the statute that the state court considered and defined the duty of the licensing authority and the rights of the appellants to a license for their parade, with regard only to considerations of time, place and manner so as to

conserve the public convenience. The obvious advantage of requiring application for a permit was noted as giving the public authorities notice in advance so as to afford opportunity for proper policing. And the court further observed that, in fixing time and place, the license served "to prevent confusion by overlapping parades or processions, to secure convenient use of the streets by other travelers, and to minimize the risk of disorder." But the court held that the licensing board was not vested with arbitrary power or an unfettered discretion; that its discretion must be exercised with "uniformity of method of treatment upon the facts of each application, free from improper or inappropriate considerations and from unfair discrimination"; that a "systematic, consistent and just order of treatment, with reference to the convenience of public use of the highways, is the statutory mandate." The defendants, said the court, "had a right, under the Act, to a license to march when, where and as they did, if after a required investigation it was found that the convenience of the public in the use of the streets would not thereby be unduly disturbed, upon such conditions or changes in time, place and manner as would avoid disturbance."

If a municipality has authority to control the use of its public streets for parades or processions, as it undoubtedly has, it cannot be denied authority to give consideration, without unfair discrimination, to time, place and manner in relation to the other proper uses of the streets. We find it impossible to say that the limited authority conferred by the licensing provisions of the statute in question as thus construed by the state court contravened any constitutional right.

There remains the question of license fees which, as the court said, had a permissible range from $300 to a nominal amount. The court construed the Act as requiring "a reasonable fixing of the amount of the fee." "The

charge," said the court, "for a circus parade or a cele-
bration procession of length, each drawing crowds of
observers, would take into account the greater public
expense of policing the spectacle, compared with the slight
expense of a less expansive and attractive parade or
procession, to which the charge would be adjusted." The
fee was held to be "not a revenue tax, but one to meet
the expense incident to the administration of the Act
and to the maintenance of public order in the matter
licensed." There is nothing contrary to the Constitution
in the charge of a fee limited to the purpose stated. The
suggestion that a flat fee should have been charged fails
to take account of the difficulty of framing a fair schedule
to meet all circumstances, and we perceive no constitu-
tional ground for denying to local governments that flexi-
bility of adjustment of fees which in the light of varying
conditions would tend to conserve rather than impair the
liberty sought.

There is no evidence that the statute has been admin-
istered otherwise than in the fair and non-discrimina-
tory manner which the state court has construed it to
require.

The decisions upon which appellants rely are not appli-
cable. In *Lovell* v. *Griffin, supra,* the ordinance pro-
hibited the distribution of literature of any kind at any
time, at any place, and in any manner without a permit
from the city manager, thus striking at the very founda-
tion of the freedom of the press by subjecting it to license
and censorship. In *Hague* v. *Committee for Industrial
Organization, supra,* the ordinance dealt with the exer-
cise of the right of assembly for the purpose of com-
municating views; it did not make comfort or conven-
ience in the use of streets the standard of official action
but enabled the local official absolutely to refuse a permit
on his mere opinion that such refusal would prevent
"riots, disturbances or disorderly assemblage." The ordi-

nance thus created, as the record disclosed, an instrument of arbitrary suppression of opinions on public questions. The court said that "uncontrolled official suppression of the privilege cannot be made a substitute for the duty to maintain order in connection with the exercise of the right." In *Schneider* v. *State, supra* (p. 163) the ordinance was directed at canvassing and banned unlicensed communication of any views, or the advocacy of any cause, from door to door, subject only to the power of a police officer to determine as a censor what literature might be distributed and who might distribute it. In *Cantwell* v. *Connecticut, supra* (p. 305) the statute dealt with the solicitation of funds for religious causes and authorized an official to determine whether the cause was a religious one and to refuse a permit if he determined it was not, thus establishing a censorship of religion.

Nor is any question of peaceful picketing here involved, as in *Thornhill* v. *Alabama,* 310 U. S. 88, and *Carlson* v. *California,* 310 U. S. 106. The statute, as the state court said, is not aimed at any restraint of freedom of speech, and there is no basis for an assumption that it would be applied so as to prevent peaceful picketing as described in the cases cited.

The argument as to freedom of worship is also beside the point. No interference with religious worship or the practice of religion in any proper sense is shown, but only the exercise of local control over the use of streets for parades and processions.

The judgment of the Supreme Court of New Hampshire is

*Affirmed.*