Leon S. KAPLAN, Plaintiff–Appellant,

v.

**COUNTY OF LOS ANGELES,**
**Defendant–Appellee.**

No. 87–6646.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 5, 1988.

Decided Jan. 23, 1990.

Robert C. Moest and David Grosz, Fleishman, Fisher & Moest, Los Angeles, Cal., for plaintiff-appellant.

Philip H. Hickok, Principal Deputy County Counsel, Sp. Services Div., County of Los Angeles, Los Angeles, Cal., for defendant-appellee.

Robert C. Fellmeth, San Diego, Cal., Linda Sullivan, ACLU Foundation of Southern California, Los Angeles, Cal., for the amici.

Before HUG, POOLE and THOMPSON, Circuit Judges.

HUG, Circuit Judge:

Judge Leon S. Kaplan of the Los Angeles Superior Court appeals the district court's adverse judgment in his suit challenging the fees charged to candidates for political office by Los Angeles County for costs associated with the publication of election statements in the County's voter's pamphlet. Kaplan contends that the cost recovery system violates his First and Fourteenth Amendment rights. Because we find no constitutional infirmity in the cost recovery system, we affirm the district court's judgment.

## I.

The California Elections Code allows candidates for nonpartisan city or county offices to prepare a statement for publication in a voter's pamphlet put out by the local government agency. Cal.Elec.Code § 10012 (West Supp.1989). The pamphlet is mailed with a sample ballot to all registered voters prior to the election. The statements of judicial candidates must be "limited to a recitation of the candidate's own personal background and qualifications and shall not in any way make reference to other candidates for judicial office or to another candidate's qualifications, character, or activities." *Id.* § 10012.1. The Code provides for a procedure by which the public and the county clerks may examine the candidate's statement prior to publication and seek an injunction or writ of mandate to enforce appropriate emendation should the statement not meet these conditions. *Id.* § 10013.5.

To defray the cost of publishing the voter's pamphlet, "[t]he local agency may estimate the total cost of printing, handling, translating,[1] and mailing the candidate's statements ... and may require each candidate filing a statement to pay in advance to the local agency his or her estimated pro rata share as a condition of having his or her statement included in the voter's pamphlet." *Id.* § 10012. The amount paid by the candidate will be adjusted if necessary after the actual publication costs are known. The local agency neither profits from these payments nor uses them to finance the costs of the election itself. *See id.*

The statute provides that, if a determination is made that the candidate is indigent, he or she is not required to pay the costs in advance. *Id.* § 10012.3. To declare indigency, the candidate must file a statement of financial worth with the local agency. The statement form may inquire into the candidate's income, personal and real property holdings, and financial obligations. The candidate must release to the local agency his or her most recent federal income tax report. If the local agency deems the candidate indigent, the agency is obligated to print and mail the statement without charge. The agency may, however, bill the candidate his or her actual pro rata share of the cost after the election. *Id.*

In 1986, Kaplan, then sitting as a judge of the Municipal Court for the Los Angeles Judicial District, decided to run in a nonpartisan election for an open seat on the Los Angeles Superior Court. Los Angeles County had estimated that, for the 1986 election, the English-only voter's pamphlet publishing costs would amount to $52,000 for the June 3, 1986, primary election and $27,500 for the November 4, 1986, general election. Kaplan originally tendered $24,-024.53 to the County to cover what he personally calculated to be the amount needed to finance his share of the publication costs for the primary election. The County Registrar refused this amount and would not accept Kaplan's statement. On March 7, 1986, Kaplan resubmitted his statement along with a check for $52,000. Six days later he withdrew his statement and eventually received a full refund.

Kaplan filed this action in the district court also on March 7, 1986, seeking an injunction against enforcement of the County's requirement for advance payment of the publication costs and a declaratory judgment that it violated the First and Fourteenth Amendments. He sought a temporary restraining order and preliminary injunction pending trial, which were denied. Kaplan appealed the denial of the preliminary injunction to this court. We affirmed the denial of the preliminary injunction on March 27, 1986, stating that although Kaplan had demonstrated the existence of serious questions of law, neither the balance of hardships nor the possible injury to Kaplan justified the relief of a preliminary injunction. We noted that Kaplan had already tendered the $52,000, concluding that it was apparent that the cost was not a bar to his candidacy and that a renewed tender and a suit for refund

---

**1.** Candidates can request that their statements be translated into Spanish. The candidate who asks for a translation pays an additional amount to cover translation costs.

would provide adequate relief if he prevailed.

Kaplan won in the primary election despite the absence of his statement in the voter's pamphlet. For the general election, he paid the prescribed advance cost of $27,500 and had his statement published. He then filed an amendment to his complaint for a declaratory judgment and a refund of the $27,500.

The case was submitted on stipulated facts with accompanying exhibits. The district court found no constitutional error in the cost recovery system and entered judgment for the County.

## II.

Kaplan presents two issues on appeal: (1) whether the cost recovery system infringes on his First Amendment rights; and (2) whether the system violates equal protection by distinguishing between candidates on the basis of financial resources. We review *de novo* these purely legal questions, *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984), and consider each claim in turn.

### A. *First Amendment*

The dimension of Kaplan's First Amendment claim is outlined by what he does not contend. Kaplan does not challenge the statute on traditional freedom of expression grounds. He does not allege content or viewpoint discrimination by the state, overbreadth, or outright suppression of a specific type of speech. He claims, instead, that the cost recovery system erects a barrier to the expression of protected speech in the limited public forum of the voter's pamphlet. Invoking strict scrutiny, he contends that the recovery system is unconstitutional because it fails to serve a compelling state interest in a narrowly drawn fashion. We agree that the voter's pamphlet constitutes a limited public forum but find that a lower level of scrutiny attaches to this classification and that the statute survives review.

There is no doubt that the candidates' statements are protected speech. Political speech lies at the core of the First Amendment's protections. "Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression...." *Buckley v. Valeo*, 424 U.S. 1, 14, 96 S.Ct. 612, 632, 46 L.Ed.2d 659 (1976) (per curiam); *see also Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272, 91 S.Ct. 621, 625–26, 28 L.Ed.2d 35 (1971) ("[T]he constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office."). The candidate's statement clearly occupies a privileged place in the domain of First Amendment protections.

The question then becomes whether access to expression of these statements in the voter's pamphlet can be restricted by the advance payment of costs. In recent years, the Supreme Court has developed the public forum doctrine to address First Amendment concerns in relation to public channels of communication. State ownership of the means or place of communication does not automatically entail unlimited public access. The "First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *United States Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 129, 101 S.Ct. 2676, 2685, 69 L.Ed.2d 517 (1981). The now-familiar forum doctrine provides for three categories of access according to the type of public property involved. The first category, the traditional public forum, consists of streets, sidewalks, and parks that, in Justice Roberts' frequently quoted words, "have immemorially been held in trust for the use of the public ... for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. Committee for Indus. Org.*, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939). Two levels of scrutiny apply to the traditional public forum. State restrictions based on content must pass a high level of review in which the restriction is shown "to

serve a compelling state interest and that it is narrowly drawn to achieve that end." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983); *see also Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 98–99, 92 S.Ct. 2286, 2291–92, 33 L.Ed.2d 212 (1972). Other restrictions not tied to content—namely, time, place, and manner restrictions—must be shown to serve a significant state interest in a narrowly tailored fashion, and to leave open ample alternative communication channels. *Perry*, 460 U.S. at 45, 103 S.Ct. at 954–55; *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3068–69, 82 L.Ed.2d 221 (1984).

■ At the other end of the spectrum stands the nonpublic forum, that is, public property and channels of communication that are not by tradition or designation subject to use for public communication. *Perry*, 460 U.S. at 46, 103 S.Ct. at 955–56. The level of scrutiny for a nonpublic forum is considerably lighter than that for a public forum. The state may restrict expression in a nonpublic forum so "long as the restrictions are 'reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view.'" *Cornelius v. NAACP Legal Defense & Educ. Fund*, 473 U.S. 788, 800, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985) (quoting *Perry*, 460 U.S. at 46, 103 S.Ct. at 955).

■ Between the public and nonpublic forum is the limited or designated public forum. This forum arises "when the Government has intentionally designated a place or means of communication as a public forum." *Id.* 473 U.S. at 800, 105 S.Ct. at 3447–48. A limited public forum is open not to the public as a whole but to a restricted class of users, *see Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), or a restricted class of subject matter; *see City of Madison Joint School Dist. No. 8 v. Wisconsin Employment Relations Comm.*, 429 U.S. 167, 175 n. 8, 97 S.Ct. 421, 426 n. 8, 50 L.Ed.2d 376 (1976). The government is, of course, not required to create or indefinitely maintain a limited public forum. However, once the government creates the forum "it is bound by the same standards as apply in a traditional public forum. Reasonable time, place, and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to effectuate a compelling state interest." *Perry*, 460 U.S. at 46, 103 S.Ct. at 955.

■ We agree with the holding of the California Court of Appeal in *Gebert v. Patterson*, 186 Cal.App.3d 868, 874, 231 Cal.Rptr. 150, 153 (1986), that the voter's pamphlet constitutes a limited public forum. California created the pamphlets for the specific purpose of allowing a limited class of speakers, the candidates, to address a particular class of topics, statements concerning the personal background and qualifications of the candidate. *See* Cal.Elec.Code § 10012.1 (West Supp.1989). The voter's pamphlet clearly falls into the category of a limited public forum.

California created this limited public forum to allow candidates for non-partisan public office to communicate their qualifications to the electorate. There is no contention that this statute limits access on the basis of content; consequently, strict scrutiny requiring a compelling state interest is not involved. Here, the limitation is the requirement that a candidate advance his or her proportionate share of the costs of providing the forum. Restrictions that are content-neutral need meet only the lesser level of scrutiny prescribed in *Perry;* they must be shown to serve a significant state interest in a narrowly tailored fashion and leave open ample alternative channels of communication. *Perry*, 460 U.S. at 45, 103 S.Ct. at 954–55.

■ Kaplan contends that the charge for Kaplan's statement of $52,000 in the primary election and $27,500 in the general election is a cost restriction that is constitutionally prohibited. The district court found that the charge was a reasonable calculation of estimated costs of publication and distribution. That finding is clearly supported by the record. Thus, we are concerned with the establishment of a means of communication that is a limited

public forum and with a division of the costs of providing that means of communication among those utilizing it.

Kaplan argues that *Cox v. New Hampshire,* 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941) as interpreted by *Murdock v. Pennsylvania,* 319 U.S. 105, 116, 63 S.Ct. 870, 876, 87 L.Ed. 1292 (1943) allows only a nominal fee to gain access to a limited public forum. *Cox* approved a city-imposed fee of $300 for the use of public streets for a parade by the Jehovah's Witnesses that was a reasonable estimate of the costs of policing the function. The *Murdock* case involved a license fee for home solicitation, unrelated to costs, that the Jehovah's Witnesses contended was a restriction on First Amendment rights. The Court distinguished the license fee from the requirement of a parade permit in *Cox,* noting that "the fee is not a nominal one, imposed as a regulatory measure and calculated to defray the expense of protecting those on the streets and at home against the abuses of solicitors." This is not a statement that *only* nominal charges to defray expenses are constitutionally permissible, but rather noting the particular distinction between the facts in *Cox* and those in *Murdock.* We find nothing in *Cox* that requires that all charges for any public forum be limited to "nominal" charges. For example, certainly reasonable rental charges can be made as a condition for granting the use of a municipal auditorium to any group on a nondiscriminatory basis.

Kaplan also relies on the Eleventh Circuit case in *Central Florida Nuclear Freeze Campaign v. Walsh,* 774 F.2d 1515 (11th Cir.1985), *cert. denied,* 475 U.S. 1120, 106 S.Ct. 1637, 90 L.Ed.2d 183 (1986), where the court struck down a city ordinance that required persons wishing to use the public streets and parks for demonstrations to prepay the costs for additional police protection, the amount to be determined in the discretion of the chief of police.

The use of public streets and parks for public expression presents a distinct situation. First, they have been used "from time immemorial" as the "quintessential public forum." *Perry,* 460 U.S. at 45, 103

S.Ct. at 954–55. Keeping order in the streets and parks is generally a public responsibility to be carried by the public at large and there is difficulty in determining which costs are appropriately attributable to a special event and which are appropriately general public responsibility. There are also dangers in leaving the determination to the discretion of a single official, in that case the chief of police.

We need not determine whether we would agree with the Eleventh Circuit decision, under the circumstances of that case, because we are dealing here with an entirely different type of public forum—one created for the specific purpose of communication and one in which the costs of creating and utilizing that public forum are easily determined. These costs are proportionally allocated among those utilizing that public forum. In this circuit, we have recognized that it does not violate the First Amendment for a public entity to collect charges that fairly reflect costs incurred by the municipality in connection with an activity involving expression. *Baldwin v. Redwood City,* 540 F.2d 1360 (9th Cir.1976), *cert. denied sub nom. Leipzig v. Baldwin,* 431 U.S. 913, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977). In this case, the charges of providing the forum have been fairly allocated.

We find no violation of the First Amendment in this cost recovery system. The state's interest in publishing voter's pamphlets in a way that does not burden local agency budgets is a substantial interest. The statute is narrowly drawn in that the local agencies can recover actual costs alone, and cannot profit from the publication charges nor finance election costs with them. The statute exempts the indigent from cost liability and leaves open a variety of alternative means for a candidate to transmit his statement to voters. In light of these factors, we deem the cost recovery system constitutional under the First Amendment.

**B. Equal Protection**

■ Kaplan contends that the cost recovery system runs afoul of the Fourteenth Amendment's equal protection clause. He characterizes the system as a state pro-

gram that distinguishes among candidates on the basis of financial resources. He relies heavily on two ballot access cases, *Bullock v. Carter*, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972), and *Lubin v. Panish*, 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974), for the proposition that the equal protection clause bars distinctions based on financial resources in the electoral arena and that such distinctions will be strictly scrutinized by the courts. Although the ballot access cases cited by Kaplan do strike down certain election statutes that excluded candidates who could not pay the filing fee, these cases offer Kaplan no ground on which to stand.

The facts in *Bullock* and *Lubin* demonstrate why these cases are inapposite to Kaplan's equal protection claims. In *Bullock*, the Supreme Court confronted a Texas statutory scheme which required each candidate to "pay a filing fee as a condition to having his name placed on the ballot in a primary election." *Bullock*, 405 U.S. at 135, 92 S.Ct. at 852 (footnote omitted). The Court emphasized that the fee was "an absolute prerequisite to a candidate's participation in a primary election." *Id.* at 137, 92 S.Ct. at 852. A candidate would not appear on the ballot if the fee were not paid. The Texas system made no exception for candidates who could not afford the fee, even though "the candidates in this case affirmatively alleged that they were *unable*, not simply *unwilling*, to pay the assessed fees." *Id.* at 146, 92 S.Ct. at 857 (emphasis in original). It provided "no alternative procedure by which a potential candidate who is unable to pay the fee can get on the primary ballot," *id.* at 137, 92 S.Ct. at 852–53, and thereby "exclud[ed] some candidates otherwise qualified [to run for office] and den[ied] an undetermined number of voters the opportunity to vote for candidates of their choice." *Id.* at 149, 92 S.Ct. at 859. The Court determined that the statute was patently exclusionary and therefore invalidated it as a violation of equal protection.

In *Lubin*, the Court examined a section of the California Elections Code that required all candidates, without exception, to pay a filing fee as a precondition to appearing on the ballot. Once again the Court emphasized that under the California law "the payment of a fee is an absolute, not an alternative, condition, and failure to meet it is a disqualification from running for office." *Lubin*, 415 U.S. at 718, 94 S.Ct. at 1321. Because the statute offered no alternatives to candidates unable to pay the fee, thereby excluding them from access to the ballot, the Court struck the statute as unconstitutional.

In this case, we do not encounter the concerns addressed in *Bullock* and *Lubin*. California's cost recovery system does not affect a candidate's access to the ballot or right to participate in an election. A candidate who does not place a statement in the voter's pamphlet, thereby entirely avoiding the cost recovery system, will still appear on the ballot. No candidate is excluded from being listed on the ballot by virtue of the cost recovery system. The County has provided one method for candidates to express their qualifications to the electorate, if they choose to do so and share the cost. If not, they can utilize other means of reaching the electorate in their election campaigns. Kaplan's reliance on *Bullock* and *Lubin*, consequently, is unavailing.

### III.

We live in an age in which population growth and technological development have made even local political races into expensive undertakings. Inevitably, some candidates will possess greater financial resources than others and will enjoy greater access to the electorate. Although this may be unfair and unsatisfactory, we, as judges, cannot iron out electoral disparity resulting from differences in candidates' financial resources. *See Buckley v. Valeo*, 424 U.S. at 54, 96 S.Ct. at 651–52. The proper institution for consideration of electoral reform to alleviate the disparity is the legislature, not the judiciary. We find no legal or constitutional infirmity in the challenged statute and affirm the district court's decision.

AFFIRMED.