**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| BARRY BAUER; NICOLE FERRY; JEFFREY HACKER; NATIONAL RIFLE ASSOCIATION OF AMERICA, INC.; CALIFORNIA RIFLE AND PISTOL ASSOCIATION FOUNDATION; HERB BAUER SPORTING GOODS, INC., *Plaintiffs-Appellants*, <br><br> v. <br><br> XAVIER BECERRA, in his official capacity as Attorney General of the State of California; STEPHEN LINDLEY, in his official capacity as Acting Chief of the California Department of Justice; DOES, 1–10, *Defendants-Appellees.* | No. 15-15428 <br><br> D.C. No. 1:11-cv-01440-LJO-MJS <br><br><br> OPINION |

Appeal from the United States District Court
for the Eastern District of California
Lawrence J. O'Neill, Chief Judge, Presiding

Argued and Submitted April 19, 2017
San Francisco, California

Before:  Sidney R. Thomas, Chief Judge, and Ferdinand F. Fernandez and Mary H. Murguia, Circuit Judges.

Filed June 1, 2017

Opinion by Chief Judge Thomas

## SUMMARY[*]

### Civil Rights

The panel affirmed the district court's summary judgment in favor of the State of California in an action challenging, on Second Amendment grounds, California Penal Code § 28225, which requires the allocation of $5 of a $19 fee on firearms transfers to fund enforcement efforts against illegal firearm purchasers through California's Armed Prohibited Persons System.

The panel held that the use of the fee to fund enforcement efforts survived intermediate scrutiny because the government has demonstrated an important public safety interest in this statutory scheme, and there was a reasonable fit between the government's interest and the means it has chosen to achieve those ends. Accordingly, the district court did not err in concluding that the use of the fee to fund the California's Armed Prohibited Persons System program, through California Penal Code § 28225, did not violate the Constitution.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Erin E. Murphy (argued), Paul D. Clement, and Edmund G. LaCour Jr., Bancroft PLLC, Washington, D.C.; C.D. Michel, Sean A. Brady, and Anna M. Barvir, Michel & Associates P.C., Long Beach, California; for Plaintiffs-Appellants.

Anthony R. Hakl (argued), Deputy Attorney General; Stepan A. Haytayan, Supervising Deputy Attorney General; Douglas J. Woods, Senior Assistant Attorney General; Office of the Attorney General, Sacramento, California; for Defendants-Appellees.

Sarah E. Tremont and Elliott Schulder, Covington & Burling LLP, Washington, D.C.; Jonathan E. Lowry and Kelly Sampson, Brady Center to Prevent Gun Violence, Washington, D.C.; for Amicus Curiae Brady Center to Prevent Gun Violence.

Efrain Staino, Ruth N. Borenstein, and Jordan Eth, Morrison & Foerster LLP, San Francisco, California, for Amicus Curiae Law Center to Prevent Gun Violence.

**OPINION**

THOMAS, Chief Judge:

In this appeal, we consider whether California's allocation of $5 of a $19 fee on firearms transfers to fund enforcement efforts against illegal firearm purchasers violates the Second Amendment. We conclude that, even if collection and use of the fee falls within the scope of the Second Amendment, the provision survives intermediate scrutiny and is therefore constitutional. We affirm the judgment of the district court.

I

California regulates firearm sales and transfers through the Dealer's Record of Sale ("DROS") system, which was created a century ago and has been updated throughout the intervening years. *See* 1917 Cal. Stat. 221, § 7. The DROS system today requires that "any sale, loan, or transfer of a firearm" be made through a licensed dealer, Cal. Penal Code §§ 27545, 28050(a), and it requires dealers to keep standardized records of all such transactions, *id.* at §§ 28100, 28160 *et seq.* This statutory framework also requires the California Department of Justice ("the Department") to run background checks prior to purchase, and to notify the dealer if a prospective firearm purchaser is prohibited from possessing a gun under federal law or under certain provisions of California law relating to prior convictions and mental illness. Cal. Penal Code § 28220.

The DROS system allows the Department to charge a fee, known as the DROS fee, to cover the cost of running these

background checks and other related expenses.[1] Cal. Penal Code § 28225. Although the use of the DROS fee was originally limited to background checks, 1982 Cal. Stat. 1472, § 129, this provision was later expanded to allow the fee to be used for "the costs associated with funding Department of Justice firearms-related regulatory and enforcement activities related to the sale, purchase, loan, or transfer of firearms," as well as certain costs incurred by other agencies in compliance with the record-keeping and notification requirements of the background check provisions. Cal. Penal Code 12076(e) (repealed 2010, replaced by Cal. Penal Code § 28225). In 1995 the legislature capped the DROS fee, with inflation adjustment to be set by regulation. Cal. Penal Code § 28225(a). With inflation, the fee was most recently set at $19 in 2004. Cal. Code Regs. Tit. 11, § 4001.

In 2011, the California Legislature further expanded the permissible uses of the DROS fee by enacting the law that is challenged in this case. This law, commonly referred to as Senate Bill 819, changed the language of § 28225 to allow the DROS fee to be used for "firearms-related regulatory and enforcement activities related to the sale, purchase, *possession*, loan, or transfer of firearms." Cal. Penal Code § 28225(b)(11) (emphasis added). In effect, this change allows the Department to use a portion of the DROS fee "for the additional, limited purpose" of funding enforcement efforts targeting illegal firearm possession *after* the point of sale, through California's Armed Prohibited Persons System ("APPS"). 2011 Cal. Stat. 5735, § 1(g).

---

[1] The statute permits the Department to "require the dealer to charge each firearm purchaser a fee," which is then remitted to the Department. Cal. Penal code § 28225.

The APPS program, established in 2001, enforces California's prohibitions on firearm possession by identifying "persons who have ownership or possession of a firearm" yet who, subsequent to their legal acquisition of the firearm, have later come to "fall within a class of persons who are prohibited from owning or possessing a firearm" due to a felony or violent misdemeanor conviction, domestic violence restraining order, or mental health-related prohibition. Cal. Penal Code §§ 30000, 30005. Essentially, these are people who passed a background check at the time of purchase but would no longer pass that check, yet still possess a firearm.

The system identifies such people by cross-referencing the Consolidated Firearms Information System ("CFIS") database of people who possess a firearm, which is generated primarily through DROS reporting, against criminal records, domestic violence restraining order records, and mental health records. Cal. Penal Code §§ 11106, 30005. This process generates a list of "armed prohibited persons," which the Department uses for "investigating, disarming, apprehending, and ensuring the prosecution" of persons who have become prohibited from firearm possession.

Since the enactment of Senate Bill 819 in 2011, the APPS program—including both the identification of armed prohibited persons and the Department's related enforcement efforts confiscating firearms from those people—has been partially funded by DROS fees.[2] However, only a portion of the DROS fee is used to fund APPS: the evidence in the record before us suggests that the cost of running background

---

[2] Most notably, in 2013, the legislature appropriated $24 million from the DROS Account to the APPS program. 2013 Cal. Stat. 2, *codified at* Cal. Penal Code § 30015.

checks and processing DROS records is approximately $14, meaning that only the remaining $5 of each DROS fee is available for APPS funding.

Barry Bauer and five other individuals and entities (collectively, "Bauer") challenge the use of this $5 portion of the DROS fee[3] to fund APPS, arguing that it violates the Second Amendment because "the criminal misuse of firearms" targeted by the APPS is not sufficiently related to the legal acquisition of firearms on which the fee is imposed. On these grounds, Bauer filed suit against the Attorney General of California and the Chief of the California Department of Justice Bureau of Firearms (collectively, "the State") in August 2011, seeking declaratory and injunctive relief under 42 U.S.C. § 1983. Bauer subsequently filed an amended complaint adding allegations regarding the 2013 appropriation of funds from the DROS account to the APPS program.

The district court granted summary judgment for the State, concluding that the DROS fee does not violate the Constitution because it falls outside the scope of the Second Amendment as a "condition[ or] qualification[] on the commercial sale of arms." *Dist. of Columbia v. Heller*, 554 U.S. 570, 626–27 (2008). In the alternative, the district court concluded that the DROS fee would survive heightened scrutiny even if the Second Amendment were implicated, because it places only a "marginal burden" on the of the core Second Amendment right. Bauer timely appealed.

---

[3] Bauer challenges only the approximately $5 portion of the DROS fee that exceeds the Department's actual costs for running background checks and processing DROS records.

The district court had jurisdiction under 28 U.S.C. § 1331, and we have jurisdiction to hear Bauer's appeal under 28 U.S.C. § 1291. "We review a district court's grant of summary judgment de novo." *Peruta v. Cty. of San Diego*, 824 F.3d 919, 925 (9th Cir. 2016) (en banc) (citing *Sanchez v. Cty. of San Diego*, 464 F.3d 916, 920 (9th Cir. 2006)). Similarly, "[w]e review constitutional questions de novo." *Id.* (citing *Am. Acad. of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1103 (9th Cir. 2004)).

II

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In the Supreme Court's seminal decision on Second Amendment rights, *District of Columbia v. Heller*, the Court articulated an individual right to bear arms but explained that this holding should not "be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." 554 U.S. at 626–27. The Court described these categories of regulation as "presumptively lawful" and noted that this list was not intended to be exhaustive. *Id.* at 627 n.26.

In accord with many of our sister circuits, "we have discerned from *Heller*'s approach a two-step Second Amendment inquiry." *Jackson v. City & Cty. of S.F.*, 746 F.3d 953, 960 (9th Cir. 2014) (citing *United States v. Chovan*, 735 F.3d 1127, 1136–37 (9th Cir. 2013)); *see also,*

*e.g.*, *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *United States v. Reese*, 627 F.3d 792, 800 (10th Cir. 2010); *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010). This two-step inquiry "(1) asks whether the challenged law burdens conduct protected by the Second Amendment and (2) if so, directs courts to apply an appropriate level of scrutiny." *Jackson*, 746 F.3d at 960 (citing *Chovan*, 735 F.3d at 1136). In determining whether a given regulation falls within the scope of the Second Amendment under the first step of this inquiry, "we ask whether the regulation is one of the 'presumptively lawful regulatory measures' identified in *Heller*, or whether the record includes persuasive historical evidence establishing that the regulation at issue imposes prohibitions that fall outside the historical scope of the Second Amendment." *Id.* (first quoting *Heller*, 554 U.S. at 627 n.26; then citing *Chovan*, 735 F.3d at 1137).

Here, Bauer contends that the challenged portion of the DROS fee burdens conduct protected by the Second Amendment because it applies to all firearm transfers, not just those that would be considered "commercial sale" in the ordinary sense. Cal. Penal Code §§ 27545, 28050, 28055(b). Thus, Bauer argues that the DROS fee does not belong to the category of "conditions and qualifications on the commercial sale of arms" that *Heller* held to be presumptively lawful at the first step of the inquiry. *See* 554 U.S. at 626–27 & n.26. The State counters that by regulating transactions conducted through commercial firearm dealers, the DROS fee is properly considered a condition on the commercial sale of arms and thus falls outside the scope of the Second Amendment under *Heller*'s first step.

We need not decide this question because the challenged portion of the DROS fee would survive heightened scrutiny even if it implicates Second Amendment protections. Therefore, for purposes of this analysis, we assume, without deciding, that the challenged fee burdens conduct falling within the scope of the Second Amendment. *See Silvester v. Harris*, 843 F.3d 816, 826–27 (9th Cir. 2016) (assuming without deciding that waiting period laws fall within the scope of the Second Amendment at step one); *Fyock v. Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015) (bypassing step one because firing-capacity regulations would survive heightened scrutiny even if they fell within the scope of the Second Amendment).

III

If a law burdens conduct protected by the Second Amendment, as we assume, but do not decide that this one does, *Heller* mandates some level of heightened scrutiny. 554 U.S. at 628 & n.27. We conclude that intermediate scrutiny is the appropriate standard for analyzing the fee scheme challenged here, and we hold that the fee survives under this standard.

A

Because *Heller* did not specify a particular level of scrutiny for all Second Amendment challenges, courts determine the appropriate level by considering "(1) how close the challenged law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on that right." *Silvester*, 843 F.3d at 821 (citing *Jackson*, 746 F.3d at 960–61). *Heller* identified the core of the Second Amendment as "the right of law-abiding, responsible citizens

to use arms in defense of hearth and home." 554 U.S. at 635. Guided by this understanding, our test for the appropriate level of scrutiny amounts to "a sliding scale." *Silvester*, 843 F.3d at 821. "A law that imposes such a severe restriction on the fundamental right of self defense of the home that it amounts to a destruction of the Second Amendment right is unconstitutional under any level of scrutiny." *Id.* (citing *Chovan*, 735 F.3d at 1138). Further down the scale, a "law that implicates the core of the Second Amendment right and severely burdens that right warrants strict scrutiny. Otherwise, intermediate scrutiny is appropriate." *Id.*

Here, Bauer argues that the core right to possess and use a firearm in the home includes a corresponding right to *purchase* a firearm, and that the core right is therefore burdened by the DROS fee. But even if we assume that the right to possess a firearm includes the right to purchase one, the burden on that right is exceedingly minimal here.

Bauer has neither alleged nor argued that the $19 DROS fee—let alone the smaller, $5 challenged portion of the fee—has any impact on the plaintiffs' actual ability to obtain and possess a firearm. Although Bauer suggests that a hypothetical $1 million fee could effectively eliminate the general public's ability to acquire a firearm, that extreme comparison underscores the minimal nature of the burden here. Indeed, in considering a fee much larger than the one here, the Second Circuit suggested in *Kwong v. Bloomberg* that even a $340 licensing fee might not be a "substantial

burden" on Second Amendment rights."[4]  723 F.3d 160, 167 (2d Cir. 2013).  On the facts before us, the challenged portion of the DROS fee does not "severely burden[]" or even meaningfully impact the core of the Second Amendment right, and intermediate scrutiny is therefore appropriate.  *See Silvester*, 843 F.3d at 821 (citing *Chovan*, 735 F.3d at 1138).

This approach is consistent with our past cases analyzing the appropriate level of scrutiny under the second step of *Heller*, as we have repeatedly applied intermediate scrutiny in cases where we have reached this step.  *Silvester*, 843 F.3d at 823 (applying intermediate scrutiny to a law mandating ten-day waiting periods for the purchase of firearms); *Fyock*, 779 F.3d at 999 (applying intermediate scrutiny to a law prohibiting the possession of large-capacity magazines); *Jackson*, 746 F.3d at 965, 968 (applying intermediate scrutiny to laws mandating certain handgun storage procedures in homes and banning the sale of hollow-point ammunition in San Francisco); *Chovan*, 735 F.3d at 1138 (applying intermediate scrutiny to a law prohibiting domestic violence misdemeanants from possessing firearms).

Similarly, our sister circuits have overwhelmingly applied intermediate scrutiny when analyzing Second Amendment challenges under *Heller*'s second step.  *See, e.g.*, *Kwong*, 723 F.3d at 168 & n.16 (law imposing a $340 licensing fee on all handguns); *NRA v. McCraw*, 719 F.3d 338, 348 (5th Cir. 2013) (law prohibiting 18-to-20-year-olds from carrying handguns in public); *Woollard v. Gallagher*, 712 F.3d 865,

---

[4] Although the DROS fee is not a licensing fee, it is analogous in the sense that it applies to essentially all means of acquiring a firearm, just as a licensing fee applies to all those who acquire and possess a firearm under a licensing or registration scheme.

876 (4th Cir. 2013) (law requiring a "good and substantial reason" for issuance of a handgun permit); *Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 96–97 (2d Cir. 2012) (law requiring a showing of "proper cause" to obtain a concealed carry permit); *Heller v. Dist. of Columbia (Heller II)*, 670 F.3d 1244, 1256–58, 1261–62 (D.C. Cir. 2011) (laws imposing registration requirements on all firearms and banning assault weapons and large-capacity magazines); *Reese*, 627 F.3d at 802 (law prohibiting possession of all firearms while subject to a domestic protection order); *Marzzarella*, 614 F.3d at 97 (law effectively prohibiting possession of firearms with obliterated serial numbers); *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (law prohibiting domestic violence misdemeanants from possessing firearms); *but see Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011) (applying "a more rigorous standard" than intermediate scrutiny, "if not quite 'strict scrutiny,'" to a law mandating firing-range training as a prerequisite to gun ownership but banning all firing ranges within the City of Chicago). In short, intermediate scrutiny is the appropriate standard for the minimal burden posed by the portion of the DROS fee challenged in this case.

B

Our intermediate scrutiny test under the Second Amendment requires that "(1) the government's stated objective . . . be significant, substantial, or important; and (2) there . . . be a 'reasonable fit' between the challenged regulation and the asserted objective." *Silvester*, 843 F.3d at 821–22 (quoting *Chovan*, 735 F.3d at 1139). The challenged portion of the DROS fee survives this test.

The government's stated objective for using a portion of the DROS fee to fund APPS, as expressed in the legislative findings in Senate Bill 819, is to target "[t]he illegal possession of . . . firearms" because illegal possession "presents a substantial danger to public safety." 2011 Cal. Stat. 5735, § 1(d).  Thus, the State asserts that its goal is "improving public safety by disarming individuals who are prohibited from owning or possessing firearms."  The legislative findings in Senate Bill 819 estimated that there were more than 18,000 armed prohibited persons in California at the time the law was passed, and the APPS program aims to target these violations. 2011 Cal. Stat. 5735, § 1(d).

As we have previously stated, "'[i]t is self-evident' that public safety is an important government interest," and reducing "gun-related injury and death" promotes public safety. *Jackson*, 746 F.3d at 965 (quoting *Chovan*, 735 F.3d at 1139).  Moreover, in light of *Heller*'s specific approval of "prohibitions on possession of firearms by felons and the mentally ill," 554 U.S. at 626–27, we have recognized that public safety is advanced by keeping guns out of the hands of people who are most likely to misuse them for these reasons. *See e.g.*, *Chovan*, 735 F.3d at 1139–40; *accord*, *Fortson v. L.A. City Attorney's Office*, 852 F.3d 1190, 1193 (9th Cir. 2017).  We therefore conclude that the State has established a "significant, substantial, or important interest" in the challenged law. *Silvester*, 843 F.3d at 821–22.  The use of the DROS fee to fund APPS thus satisfies the first prong of intermediate scrutiny.

Under the second prong of the intermediate scrutiny test, we require a "reasonable fit" between the government's stated objective and its means of achieving that goal, and we "have

said that 'intermediate scrutiny does not require the least restrictive means of furthering a given end.'" *Id.* at 827 (quoting *Jackson*, 746 F.3d at 969).

Given the State's important interest in promoting public safety and disarming prohibited persons under the first prong of the test, there is a "reasonable fit" between these important objectives and the challenged portion of the DROS fee. As we have noted, the statute provides that the DROS fee is intended to fund "costs associated with funding Department of Justice firearms-related regulatory and enforcement activities related to the sale, purchase, possession, loan, or transfer of firearms." Cal. Penal Code § 28225(b)(11). Because the APPS program involves the investigation of illegally armed individuals and enforcement of firearms laws, there is certainly a fit between the legislative objective and the use of the DROS fee. Indeed, the unlawful firearm possession targeted by APPS is the direct result of certain individuals' prior acquisition of a firearm through a DROS-governed transaction.

The legislative history supports this conclusion. The California Senate Committee considering the legislation stated in its report that it "would clarify that [the Department] is permitted to use DROS funds to pay for its efforts to retrieve unlawfully possessed firearms and prosecute individuals who possess those firearms despite being prohibited by law from doing so." Sen. Comm. on Public Safety, Analysis of S.B. 819, 2011–12 Reg. Sess., at 11 (April 26, 2011). In addition, the legislative history indicates that, like the use of the DROS fee to fund a background check at the time of purchase, the use of the DROS fee to fund APPS simply allows ongoing enforcement when some of "those same individuals" later become prohibited from possessing a

firearm. Assem. Comm. on Appropriations, Analysis of S.B. 819, 2011–2012 Reg. Sess., at 2 (July 6, 2011).

Moreover, we have emphasized that "'intermediate scrutiny does not require the least restrictive means of furthering a given end.'" *Silvester*, 843 F.3d at 827 (quoting *Jackson*, 746 F.3d at 969). Accordingly, the fact that not *all* DROS fee payers will later be subject to an APPS enforcement action does not signify that this use of the DROS fee is unconstitutionally broad. *Cf. Jackson*, 746 F.3d at 967 (concluding that the fit was reasonable even though the regulation could have been drawn more narrowly, because the burden was minimal and intermediate scrutiny does not require the least restrictive means). Thus, with the limited burden and the close relationship between firearm acquisition and monitoring of illegal possession, the State has established the requisite "reasonable fit" to satisfy the second prong of the intermediate scrutiny test.

C

Bauer argues that traditional Second Amendment intermediate scrutiny should not apply because this case involves a fee. He urges us to apply the line of "fee jurisprudence" that was developed by the Supreme Court in the First Amendment context to assess the constitutionality of fees imposed on the exercise of constitutional rights. We have recognized that there are other elements of Second Amendment jurisprudence that have First Amendment analogies. *See Jackson*, 746 F.3d at 960. However, we need not—and do not—decide whether First Amendment fee

jurisprudence applies here because the fee easily survives that inquiry.**[5]**

Under First Amendment fee jurisprudence, the two seminal cases on the constitutionality of fees are *Cox v. New Hampshire*, 312 U.S. 569 (1941), in which permit and fee requirements for parades and public rallies were upheld, and *Murdock v. Pennsylvania*, 319 U.S. 105 (1943), in which license and fee requirements for solicitors were struck down. In *Cox*, the Supreme Court explained that a fee imposed on the exercise of a constitutional right must not be a general "revenue tax," but such a fee is lawful if it is instead designed "to meet the expense incident to the administration of the act and to the maintenance of public order in the matter licensed." 312 U.S. at 577. The Court reiterated this principle in *Murdock*, striking down the licensing fee in that case because it was "not a nominal fee imposed as a regulatory measure to defray the expenses of policing the activities in question." 319 U.S. at 113–14. Following this precedent, we have similarly held that a "state may . . . impose a permit fee that is reasonably related to legitimate content-neutral considerations, such as the cost of administering the ordinance" in question, as long as the ordinance or other underlying law is itself constitutional. *S. Oregon Barter Fair v. Jackson Cty.*, 372 F.3d 1128, 1139 (9th Cir. 2004).

Attempting to apply this precedent in the Second Amendment context, Bauer argues that the APPS program is

---

**[5]** The fact that the State did not contest which form of intermediate scrutiny applied before the district court, but only raised that question on appeal, also cautions against us deciding an issue not fully developed in the district court.

not sufficiently related to the DROS fee because targeting illegal firearm *possession* via APPS is not closely related to the legal *acquisition* of firearms governed by the DROS requirements.  Because he defines the regulated activity as being limited to firearm acquisition, Bauer contends that the cost of APPS cannot be considered an "expense[] of policing the activities in question."  *Murdock*, 319 U.S. at 113–14. However, this argument is undermined by Bauer's own contention, under the first step of *Heller*, that the DROS fee burdens the Second Amendment right of possession precisely because it governs essentially *all* means of acquiring a firearm in California.  *See* Cal. Penal Code §§ 27545, 28050, 28055(b).  In light of this reality, DROS-regulated firearm transactions are in fact a close proxy for subsequent firearm possession, and targeting illegal possession under APPS is closely related to the DROS fee.

Moreover, despite Bauer's emphasis on the fact that only a small subset of DROS fee payers will later become illegal possessors targeted by APPS, we note that essentially everyone targeted by the APPS program was a DROS fee payer at the time he or she acquired a firearm.  *Cf. Silvester*, 843 F.3d at 827 (explaining that intermediate scrutiny does not require least restrictive means).  Indeed, each instance of firearm possession targeted by APPS is a direct result of a DROS-governed transaction.  Along similar lines, Bauer concedes that it is appropriate for the State to use the DROS fee to fund a background check at the time of purchase.  The APPS program is, in essence, a temporal extension of the background check program.  The APPS program therefore, can fairly be considered an "expense[] of policing the activities in question," *Murdock*, 319 U.S. at 113–14, or an

"expense incident to . . . the maintenance of public order in the matter licensed," *Cox*, 312 U.S. at 577.**[6]**

Because a tax on a constitutional right may not be used to raise general revenue, *Cox*, 312 U.S. at 577, Bauer contends that the DROS fee may not exceed the "actual costs" of processing a license or similar direct administrative costs. But in fact, nothing in our case law requires that conclusion.**[7]** While we have not previously decided whether ongoing enforcement costs may be considered part of the "expense incident to . . . the maintenance of public order in the matter licensed," *Cox*, 312 U.S. at 577, several of our sister circuits have held that "it is permissible to include the costs of both administering and enforcing [the relevant licensing or permitting statute] in determining the constitutionality of [a] registration fee." *Nat'l Awareness Found. v. Abrams*, 50 F.3d 1159, 1166 (2d Cir. 1995) (upholding a registration fee on charitable organizations, fundraisers, and solicitors); *see also Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville &*

---

**[6]** The other federal courts that have considered firearm licensing or registration fees under the fee jurisprudence framework have similarly upheld those fees, each of which was larger than the challenged portion of the DROS fee here. *Heller III*, 801 F.3d at 301; *Kwong*, 723 F.3d at 166; *Second Amendment Arms v. City of Chicago*, 135 F. Supp. 3d 743, 766 (N.D. Ill. 2015); *Justice v. Town of Cicero*, 287 F. Supp. 2d 835 (N.D. Ill. 2011). Again, although the DROS fee is not a licensing fee, it is analogous in the sense that all those who possess a firearm must pay the fee at the outset.

**[7]** The case Bauer cites in support of this argument, *Kaplan v. Cty. of Los Angeles*, 894 F.2d 1076 (9th Cir. 1990), does not actually require that fees be limited to the direct costs of processing licenses or permits; it merely states that the statute *in that case* was clearly narrowly drawn because it allowed local agencies to "recover actual costs alone," *id.* at 1081.

*Davidson Cty.*, 274 F.3d 377, 395–96 (6th Cir. 2001) (accounting for ongoing enforcement costs in upholding a licensing fee on nude dancing establishments).

Moreover, where the initial fee enables an activity that has ongoing impacts, such as the purchase of firearms or the licensing of an adult entertainment establishment as in *Deja Vu*, there is an even stronger argument for including ongoing enforcement as part of the costs of "policing the activities in question." *Murdock*, 319 U.S. at 113–14. To the extent that fee jurisprudence applies in the Second Amendment context, therefore, we conclude that enforcement costs are properly considered part of the "expense[] of policing the activities in question" permitted under *Murdock* and *Cox*. *Murdock*, 319 U.S. at 113–14. Accordingly, the enforcement activities carried out through the APPS program are sufficiently related to the DROS fee under this line of jurisprudence, and the second prong of the intermediate scrutiny test is therefore satisfied even considered through the lens of First Amendment fee jurisprudence, which may or may not apply.

## D

In sum, the use of the DROS fee to fund APPS survives intermediate scrutiny because the government has demonstrated an important public safety interest in this statutory scheme, and there is a reasonable fit between the government's interest and the means it has chosen to achieve those ends.[8] Accordingly, the district court did not err in

---

[8] In reaching our conclusion, we need not, and do not, decide what the result would be if the DROS fee were used to enforce firearm possession laws in general through the APPS program, or otherwise, rather than

concluding that the use of the DROS fee to fund APPS, through California Penal Code § 28225, does not violate the Constitution.

IV

Where a law poses a minimal burden on core Second Amendment rights in furtherance of an important government interest, the federal courts have universally upheld it. We do the same here. In doing so, we need not—and do not—decide whether the fee implicates the Second Amendment, nor do we decide whether First Amendment fee jurisprudence should be applied in analyzing whether the provision passes the intermediate scrutiny test. Because, even assuming the Second Amendment applies in this context, California's use of the DROS fee to fund the APPS program survives intermediate scrutiny under either test, we affirm the district court's grant of summary judgment in favor of the State.

**AFFIRMED.**

---

firearm possession laws as they apply to those who legally acquired a firearm by paying the fee.