988 F.Supp. 667 (1997)
Robert TURLEY, Plaintiff,
v.
NEW YORK CITY POLICE DEPARTMENT and New York City Department of Parks and Recreation, Ramond W. Kelly, in his official capacity, and Betsy Gotbaum, William F. Dalton, Alexander R. Brash, Michael Fox, Kevin Dougherty, and Raymond Spinella, in their individual and official capacities, Defendants.
No. 93 CIV. 8748(SAS).
United States District Court, S.D. New York.
December 18, 1997.
*668 Robert Perry, Brooklyn, NY, for Plaintiff.
Albert Fredericks, Dana Biberman, Corporation Counsel, New York, NY, for Defendants.

OPINION AND ORDER
SCHEINDLIN, District Judge.

I. Introduction
Plaintiff Robert Turley ("Turley"), a self-proclaimed street musician, brings this action for declaratory and injunctive relief, claiming, inter alia, that New York City's scheme for regulating the use of sound amplifiers in public spaces violates his rights under the First and Fourteenth Amendments to the United States Constitution and the New *669 York State Constitution. Under Section 10-108 of Title 10 of the New York City Administrative Code ("Section 10-108"), one who seeks to use a sound amplifier adjacent to a public street or park must first obtain a sound device permit ("SDP") from the police precinct that covers the location at which the amplifier will be used. Plaintiff's action initially challenged two SDP fee schedules: (1) prior to 1996, the New York City Police Department ("NYPD", "City", or "Defendant") charged a daily SDP fee of $29; and (2) since 1996, the City has charged an SDP fee of $45 for the first day and $5 per day for up to four additional, consecutive days at the same location.
After a six-day trial, a jury found, inter alia, that the former fee of $29 per day was excessive, but that the current fee of $45 per day and $5 for four consecutive days was not excessive. Plaintiff subsequently moved for a new trial on the issue of whether the current permit fee is excessive. In an Opinion and Order dated August 22, 1997, I granted that motion because the jury was not asked whether the $45 per day fee for a single-day permit exceeded the cost of processing a single permit, making it impossible to reconcile the jury's decisions that a $29 per day fee was excessive, but a $45 daily fee was not. See Turley v. New York City Police Dep't, 988 F.Supp. 675, (S.D.N.Y.1997). A bench trial on this issue was held on November 10 and 11, 1997.

II. Findings of Fact
Plaintiff is a self-employed street musician who plays the treble bass, a ten-string electrical guitar that requires a sound amplifier to be audible, in several of New York City's public spaces. Trial Transcript ("Tr.") at 32-33. Turley testified that he performs five days each week for about fifty weeks of the year, from about noon until 10 p.m. Tr. at 33. Turley plays primarily in three locations: on a traffic island on Broadway between 43rd and 44th Streets, on the northwest corner of Broadway and 47th Street, and on the northwest corner of Broadway and 45th Street. Tr. at 34. To play at these locations, Turley applies for SDPs at the Midtown South and Midtown North police precincts.[1] Turley testified that over a fifty-two week period, he applies for a five-day permit approximately twenty-six times at Midtown North and approximately twenty-six times at Midtown South. Tr. at 41. Each five-day permit costs $65: $45 for the first day and $5 per day for each of the next four days at the same location.
At trial, the City presented evidence supporting its position that the administrative cost of issuing an SDP is $45 for a one-day permit. The City's evidence relied on two assumptions of primary importance: (1) that the average SDP is processed in one hour, and (2) that the persons processing the SDPs earn a senior patrolman's salary. To understand the importance of these two assumptions, it is necessary to review the City's cost calculation methodology.

A. The City's Cost Calculation Methodology

New York City's Office of Management and Budget ("OMB") follows a defined methodology  the user service cost analysis ("USCA")  to determine the cost of providing licenses and permits, including loft board permits, gun licenses, Fulton Fish Market permits, and SDPs. Tr. at 157-58. The OMB distributes the same USCA form and instruction sheet to approximately 55 City agencies, including the NYPD. Id. The USCA form requires the agency to determine (1) the salary and fringe benefits attributable to providing the permit or license ("personal service" costs); and (2) the costs directly attributable to providing the permit or license, other than the personal service costs ("OTPS" costs). See Df.'s Ex. M. The sum of the personal service and OTPS costs equals the total direct cost of the license or permit. The total indirect cost is then calculated by adding (1) executive management overhead, (2) administrative service overhead, (3) space and utilities costs, (4) cost of other agency *670 services, and (5) miscellaneous indirect costs. Id. The sum of the total direct cost and total indirect cost equals the total cost of the license or permit. Id. The cost of each individual permit or license is then calculated by dividing the total cost by the number of permits or licenses issued. Id. Based on the calculated cost of a permit or license, the agency preparing the USCA form recommends the fee necessary to cover the cost of providing the permit or license. Tr. at 158-60. A deputy assistant director at the OMB reviews the agency's USCA form and adopts or modifies the agency's recommendation and proposes a fee for OMB approval. Tr. at 177.
Lieutenant Edward Paroulek prepared the NYPD's USCA for fiscal year 1997 which served as the basis for the City's SDP cost estimate. Tr. at 192-93. Attached to the USCA form prepared by Officer Paroulek are two pages that present the calculations which Paroulek made in determining the appropriate figures to include on the USCA form. See Df.'s Ex. M. Paroulek calculated that the City's cost for each SDP issued in 1996 was $91.12. Id. In reaching this result, Paroulek made several assumptions. First, he assumed that a patrolman with an hourly salary of $24.47 works for two hours on each permit, costing the city $48.94 in salary for each SDP. See Df.'s Ex. M; Tr. at 194-95. Paroulek also calculated that the senior patrolman's hourly fringe benefits of $11.73 cost the City an additional $23.46. See Df.'s Ex. M. The costs of executive management overhead and administrative overhead (collectively, "overhead costs") were calculated by multiplying the total direct cost, of which the senior patrolman's salary and fringe benefits were major components, by predetermined ratios, .0701 and .1035 respectively. Id.; see also Tr. at 164-65. The cost of a senior patrolman's salary and fringe benefits for two hours of work ($72.40) multiplied by the predetermined overhead cost ratios equals $12.57 of overhead costs per permit. These figures total to $84.97.[2]

B. Paroulek's Modifications to SDP Cost Calculation

Paroulek's two hour estimate was based on the assumption that a senior patrolman works for one hour in processing an SDP and one hour inspecting and measuring the requested permit location to determine if that location is suitable for the proposed use. Tr. at 194-95. Because location investigation is not necessary for every permit, Paroulek separated the location investigation costs from the processing costs by dividing the $92.12 total SDP cost in half, attributing $45.56 to processing the SDP and $45.56 to investigating the requested location. Tr. at 194-95. Paroulek then recommended a fee of $45 for permit processing and $45 for location measuring. See Df.'s Ex. M. Anthony DeLorenzo, the deputy assistant director of the OMB who reviewed Paroulek's USCA for SDPs, chose not to include the cost of investigating a requested SDP location in proposing a permit fee to the OMB, but included only the estimated cost of processing the permit. Tr. at 170-71. The OMB accepted DeLorenzo's proposed fee of $45 and the City Counsel adopted this as the fee for an SDP. Tr. at 177.
The $45 per permit estimate assumes that a senior patrolman spends one hour processing each permit. Thus, if the City overestimated either the salary and fringe benefits of the permit preparer or the time required to prepare a permit, then the license fee does not reflect the City's actual cost. The next step, then, is to evaluate the City's salary and processing time assumptions.

C. Salary, Benefits, and Processing Time Determinations

Officer Paroulek testified that his staff and time assumptions were based on his recollection of SDP processing from 1989 to 1993 at the 25th Precinct, where he served as the *671 administrative lieutenant.[3] Tr. at 188, 193-95. Paroulek's duties included the supervision of SDP processing, which was performed by experienced patrol officers, who spent approximately one hour processing each permit. Tr. at 189-90. Additional time was required for "putting together a detail which would be police officers to insure the safety of everyone participating" in a large outdoor event, like a street fair or outdoor mass. Tr. at 191. Paroulek's recollection of permit processing conflicts with evidence of current practices in the processing of permits in Midtown North and Midtown South. These precincts process approximately 25 percent of the City's SDPs, including nearly all of the permits for which Turley applies. Tr. at 40, 223-24, 241.
At Midtown South, the processing of SDPs is performed by Pat Gaffney, a civil service employee with the title of senior police administrative aide ("SPAA"), not by a senior patrolman. Tr. at 48, 138. There is no evidence in the record regarding the hourly salary or benefits of an SPAA. However, based on testimony that the annual salary of an SPAA is $30,000, the hourly salary and fringe benefits of an SPAA are likely to be forty percent less than that of a senior patrolman, who receives an annual salary of $51,088. Tr. at 171-72, 216-17.
According to Gaffney's testimony, she spends an average of ten to fifteen minutes assisting each SDP applicant with the SDP application form and interviewing the applicant. Tr. at 137. Gaffney testified that she then confirms that the requested location is available on the desired date by checking the precinct's record book and calling the borough office, types up the permit, obtains approval from the commanding officer, obtains the signature of the administrative lieutenant or his designee, and collects the permit fee. Tr. 143-45. This process requires an additional fifteen or twenty minutes of Gaffney's time. Tr. at 144-45. Usually, Gaffney provides the applicant with the permit on the date that the application is submitted. Tr. at 145. Between the period that the permit is requested and the performance date, Gaffney re-checks the availability of the requested site. Tr. at 146. If that site is unavailable, she telephones the applicant to arrange an alternative time or location. Tr. at 146. Even under a liberal assumption that this re-checking and an occasional rescheduling requires an average of fifteen minutes per permit, Gaffney averages no more than 45 minutes processing an SDP application. Gaffney also testified that when a noise complaint is received, the precinct dispatches officers to investigate. Tr. at 149.
At Midtown North, the person now primarily responsible for processing SDPs is also an SPAA. Tr. at 137, 47. Before March 1997, Officer Donna Fittipaldi processed sound device permits at Midtown North. Tr. at 116-19. According to Fittipaldi, she followed the same process as Gaffney in processing an SDP application, except that she usually required that applicants return to the precinct to pick up the permit on the date of the performance. Tr. at 125-26, 128.
Fittipaldi assisted the applicant in completing the permit application form; interviewed the applicant; located a translator, if necessary; checked for conflicts at the desired location by reviewing station house records and calling the borough command, as well as the Mayor's office; and found alternate locations when the requested location was unavailable. Tr. at 123-27. This process required, on average, between 20 and 30 minutes. Tr. at 120. When the permit applicant returned to pick up the permit, Fittipaldi collected the permit fee, typed up the permit, and called community affairs, a process which required 20 to 25 additional minutes. Tr. at 130. Thus Fittipaldi's processing efforts also averaged approximately 45 minutes per SDP. Additionally, Fittipaldi testified that when the NYPD received noise complaints related to the use of sound amplifiers, an officer was dispatched to the permit location with a sound meter to investigate the complaint. Tr. at 130.
Turley testified that at Midtown South, he never filled out an application, but instead *672 telephoned Gaffney to tell her where he wanted to play, and the permit was ready when he arrived to pick it up. Tr. at 48. According to Turley, Gaffney spent approximately five minutes typing the permit when he arrived. Tr. at 48. Turley further testified that prior to 1997, the time required for obtaining a permit at Midtown North was approximately five minutes, and the longest that he ever waited for an SDP was ten minutes, when the clerk was "joking and just talking to fellow employees." Tr. at 47. Turley did not testify as to the time required to obtain a permit from Midtown North during 1997. Turley's five minute estimates for both precincts do not include the time that the permit processors spent checking for conflicts at the requested location before his arrival or after his departure.
Though the 45 minute estimates provided by Gaffney and Fittipaldi appear high in light of Turley's testimony, I need not resolve this conflict. At this stage it is only necessary to conclude that the time required for processing an average SDP does not exceed 45 minutes.[4]

III. Conclusions of Law
It is well-settled that both music and speech amplified by mechanical means are protected by the First Amendment, see Ward v. Rock Against Racism, 491 U.S. 781, 790, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989); Saia v. New York, 334 U.S. 558, 561-62, 68 S.Ct. 1148, 1150-51, 92 L.Ed. 1574 (1948); Carew-Reid v. Metropolitan Transportation Authority, 903 F.2d 914, 916 (2d Cir.1990), and that the City's streets and parks are public fora. See Perry Education Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45, 103 S.Ct. 948, 954-55, 74 L.Ed.2d 794 (1983). Though a state may not tax such constitutionally-protected speech, it may impose reasonable time, place, and manner regulations that are content neutral, if the restrictions are narrowly tailored to serve significant government interests and leave open alternative channels of communication. See Ward, 491 U.S. at 791, 109 S.Ct. at 2753-54; United States v. Grace, 461 U.S. 171, 177, 103 S.Ct. 1702, 1707, 75 L.Ed.2d 736 (1983). "Thus, fees that serve not as revenue taxes, but rather as means to meet the expenses incident to the administration of a regulation and to the maintenance of public order in the matter regulated are constitutionally permissible." National Awareness Found v. Abrams, 50 F.3d 1159, 1165 (2d Cir.1995) (citing cases). Plaintiff does not challenge the existence of the City's licensing requirement for SDPs, but rather the fee charged for obtaining that license.[5]

A. General Principles of Fee Determination

The cost of obtaining a permit or license fee must be calculated to "meet the expense incident to the administration of the act and to the maintenance of public order in the matter licensed." Cox v. New Hampshire, 312 U.S. 569, 571, 61 S.Ct. 762, 763-64, 85 L.Ed. 1049 (1941); see also Abrams, 50 F.3d at 1165. A fee in excess of the amount necessary to offset these costs is impermissible. See Eastern Connecticut Citizens Action Group v. Powers, 723 F.2d 1050, 1056 (2d Cir.1983). The calculation of costs incident to a permit or licensing scheme may include both the administrative costs and the enforcement costs "necessary to ensure that the purposes of [the regulatory scheme] are served." Abrams, 50 F.3d at 1166.

B. Variable and Total Cost Measures

Plaintiff contends that a permit fee may not exceed the average variable cost of administering and enforcing the permit *673 scheme. Plaintiff's theory is based on an analogy to private sector businesses where variable costs are those which "fluctuate with a firm's output," and fixed costs are "those which are independent of output." Northeastern Tel. Co. v. American Tel. & Tel. Co., 651 F.2d 76, 87 (2d Cir.1981). See Plaintiff's Post-Trial Memorandum of Law, Corrected Copy ("Pl.'s Mem.") at 3-4. Turley argues that neither the salary nor the fringe benefits of the permit processors may be included in the permit cost calculation, because those persons would be employed whether or not the permit scheme existed.[6]
In support of this contention, Plaintiff relies principally on Cox v. New Hampshire, in which the Court held that a municipality could adjust a permit fee to reflect the expense of policing the specific event for which a permit is issued. Cox merely supports the proposition that a municipality may use a sliding scale in setting its fees according to the size of the event. The Court there did not suggest that in setting a fee for either large or small events, the municipality could not consider either fixed costs in general or manpower costs in particular.
Furthermore, Plaintiff's proposed methodology is inconsistent with the approach of averaging total costs which courts have regularly followed. See, e.g., Abrams, 50 F.3d 1159 (upholding fee for professional fundraising where fee calculations included salaries and fringe benefits of those enforcing regulatory scheme and building-related expenses); Stonewall Union v. City of Columbus, 931 F.2d 1130, 1136-37 (6th Cir.1991) (city may use the "full cost" accounting methodology in determining the fee for parade permit); Mobile Sign, Inc. v. Town of Brookhaven, 670 F.Supp. 68, 74 (E.D.N.Y.1987) (upholding permit fee for mobile signs where fee calculations included secretarial and office expenses and cost of supervisor's time). Accordingly, the City may consider fixed costs, including the salary and fringe benefits of those who administer and enforce the regulatory scheme.

C. Distinguishing Between "Regular" and Other SDP Applicants

Plaintiff also contends that the City should charge a different fee to "regular" applicants than to other SDP applicants. See Pl.'s Mem. at 8-9. Again citing Cox v. New Hampshire, Plaintiff argues that the City's permit fee must take account of the lower cost of processing applications for those who apply on a regular basis. Id. In Cox, the Court held:
The suggestion that a flat fee should have been charged fails to take account of the difficulty of framing a fair schedule to meet all circumstances, and we perceive no constitutional ground for denying to local governments that flexibility of adjustment of fees which in light of varying conditions would tend to conserve rather than impair the liberty sought.
312 U.S. at 577, 61 S.Ct. at 766. Contrary to Plaintiff's assertion, the Cox Court held only that a municipality could elect to charge a different fee to applicants depending on the enforcement costs associated with each individual permit, not that it was required to do so.
The City is not required to consider all the factors which affect the cost of processing and enforcing any given SDP, thus calibrating a unique SDP fee for each applicant. In light of the multitude of considerations that might affect processing time or enforcement costs, such a requirement would not only be unduly burdensome,[7] but would also grant the City's representative an impermissible degree of discretion. See Forsyth County v. Nationalist Movement, 505 U.S. 123, 132-33, 112 S.Ct. 2395, 2402-03, 120 L.Ed.2d 101 (1992) (rejecting scheme authorizing municipal *674 officials to set license fees for expressive activity depending on actual administrative costs, because such discretion would enable officials to discourage a disfavored message by imposing a higher fee); see also Abrams, 50 F.3d at 1167 (approving flat fee on expressive activity because, inter alia, the fee was "statutorily set", and thus the government was "afforded no discretion in imposing the fee based on speech content").
Nor is the City required to take account of an applicant's familiarity with the SDP application process.[8] Even if an applicant's familiarity with the process reduced the time and cost of processing SDP applications, there is no principled basis for requiring that the City create a fee schedule reflecting that factor as opposed to other factors which affect the costs incident to the issuance of an individual permit.[9] In fact, courts have regularly upheld permit or license schemes that impose the same flat fee on all applicants. See, e.g., Abrams, 50 F.3d at 1167; United States Labor Party v. Codd, 527 F.2d 118 (2d Cir.1975) (upholding flat $5 fee for sound amplification device permits). Accordingly, the City need not prove that the permit fee offsets the cost of processing the application of a "regular" applicant, but only that the permit fee equals the average cost per permit of administering and enforcing the SDP scheme.

D. Burden of Proof

The entity imposing a permit or license fee has the burden of proving that the fee equals the costs associated with the regulatory scheme. See Eastern Connecticut Citizens, 723 F.2d at 1056 (permit fee violates First Amendment where government fails to prove that the fee charged is equal to the cost incurred in processing permit). Here, the City carries the burden of proof on the issue of the reasonableness of the SDP fee.

IV. Discussion
The City has not presented sufficient evidence to justify the $45 per permit charge. While there may be some precincts in which the permit processor receives the salary of a senior patrolman, the record contains no such evidence. Rather, the record shows that many, perhaps most, SDPs are processed by senior police administrative assistants, who earn an annual salary of approximately forty percent less than that of a senior patrolman. The record therefore strongly indicates that even if a permit issuer spends one hour processing each permit, the City has significantly overestimated the hourly salary and benefits of the permit processors.[10]See, e.g., Tr. at 241. A forty-percent revision of the City's assumption of the permit processors' hourly salary and benefits would translate to a nearly equivalent revision of permit costs. Therefore, the City's significant overestimation of salary and benefits reveals a serious miscalculation of SDP processing costs.
However, the constitutionality of the $45 fee does not depend entirely on the accuracy *675 of the City's estimate of the permit processors' salary and benefits. The City would prevail if it could prove that other costs incident to the SDP scheme offset the effect of the USCA's inaccuracies. For example, the salary and benefits of officers who inspect the requested permit locations and enforce the permit scheme could be included in the calculation of costs. However, the City has provided no evidence of (1) the frequency with which inspection or enforcement occurs, (2) the average time required for an inspection or for enforcement, or (3) the salaries of those engaged in inspection or enforcement. Thus the record does not provide sufficient evidence from which to estimate these costs.[11]
After considering all the evidence presented by the City that might bear on the cost of an SDP, I find that the City has not satisfied its burden of proving that the average cost of processing an SDP equals or exceeds the current $45 fee.[12] The City's current SDP fee structure is unreasonable and therefore violates Plaintiff's First Amendment rights.

V. Conclusion
For the reasons set forth above, judgment is granted to Plaintiff. Based on this record, Defendant NYPD is enjoined from charging a fee of $45 or more for a one-day sound device permit.
SO ORDERED.
NOTES
[1] The Midtown North Precinct encompasses the area from the West Side Highway to Lexington Avenue, and from 44th Street to Central Park South. Tr. at 118. The Midtown South Precinct is located below 44th Street.
[2] The other costs that Paroulek included in his USCA calculations were the salary and fringe benefits of the officers who transport permit fees to the borough office ($2.05), the salary and fringe benefits of the accountants who process the permit fees ($.51), the OTPS costs ($2.22), the overhead costs associated with transportation, accounting, and OTPS costs ($.84), and the cost of other agency services ($.53). See Df.'s Ex. M.
[3] The 25th Precinct encompasses the area from 115th Street to 132d Street, and from Central Park to the Hudson River. Tr. at 188.
[4] Both Fittipaldi and Gaffney testified that they processed the SDP fees that they received. Tr. at 129, 147. Neither witness testified to the time required for this process. Based on their testimony, it appears that the fee-processing procedures would require only a few minutes for all of the permit fees collected that day. This process adds minimal time to the average processing time of each permit and does not affect my conclusion.
[5] In an earlier Opinion, this Court granted in part and denied in part Turley's motion for summary judgment, holding that Section 10-108 satisfies the requirements of content neutrality, narrow tailoring, and advancement of significant government interests. See Turley v. New York City Police Dep't, 93 Civ. 8748, 1996 WL 93726, at *4-7 (S.D.N.Y. March 5, 1996).
[6] Plaintiff's assumption that labor costs are fixed, rather than variable, is open to dispute. See Northeastern Tel. Co., 651 F.2d at 86 ("[v]ariable costs typically include ... labor"). Whether the City would hire fewer police officers or administrative aides if the task of issuing SDPs were eliminated is also uncertain.
[7] As a practical matter, a permit processor could not make such a determination. For example, on a few occasions, after Turley had paid for and received an SDP for a particular location, Gaffney learned that a conflict had developed that prevented Turley's use of that location. Tr. at 46. She was then required to contact him and issue him a new permit for a different date. Id.
[8] If the costs incident to an SDP issued to someone familiar with the application process were significantly different than the costs involved in issuing an SDP to other applicants, then First Amendment considerations might require a separate permit fee for those familiar with the process. See Murdock v. Commonwealth of Pennsylvania, 319 U.S. 105, 113-14, 63 S.Ct. 870, 875-76, 87 L.Ed. at 1292 (1943). However, I need not reach that issue here. The evidence at trial revealed that with the exception of explaining the application form and permit requirements to the applicant, permit processors follow the same steps for processing the SDPs of "regular" applicants as for other applicants. See Tr. at 105, 121, 141.
[9] Such factors might include: (1) the permit processor's familiarity with the location; (2) the applicant's language skills; (3) the applicant's choice of space, which might require resolving competing requests for a popular location; and (4) the proximity of the requested location to residences or businesses, which could affect the likelihood of noise complaints. For example, Gaffney testified that she spent a "large amount of time" attempting to resolve disputes between two "regular" permit applicants  Turley and the Hebrew Israeli School. Tr. at 142-43, 151-52. On multiple occasions, the two applicants sought permits for the same location: the traffic island on Broadway between 43rd and 44th streets at which Turley regularly performs. Id. Resolving one recent conflict required that Gaffney meet with the school's representatives in person three times, telephone Turley, and attempt to negotiate an amicable solution to the conflict. Id. at 142.
[10] Furthermore, as discussed above, the evidence reflects that the time estimate for processing a license should be reduced by 25 percent, i.e., from one hour to 45 minutes.
[11] Furthermore, the costs of enforcement efforts cannot be included in a license or permit fee "simply because they are related to the enforcement" of the regulatory scheme. Abrams, 50 F.3d at 1166. Rather, the "inclusion of particular enforcement costs should be determined case-by-case." Id. Therefore, to prove enforcement costs, the City must provide evidence that its enforcement efforts are directly related to the SDP permit scheme, and not to some other regulatory scheme. George Brown, an assistant chief of the NYPD, testified that a separate regulatory scheme governs large events, like parades or demonstrations, and that the planning, enforcement, and oversight of such events occur outside the SDP process. Tr. at 103-04. Absent evidence that such a police presence is directly related to the SDP scheme, Paroulek's testimony that officers at the 25th Precinct were dispatched to control street fairs or an outdoor mass is not probative of the costs of enforcing the SDP scheme.
[12] I therefore need not evaluate the $5 fee for each successive day at the same location.